BOYNTON CAB COMPANY, a Wisconsin corporation, Appellant-Petitioner,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, a Wisconsin state agency, Respondent.

Supreme Court

*No. 77–652. Argued March 3, 1980.—Decided May 13, 1980.*

(Also reported in 291 N.W.2d 850.)

For the appellant-petitioner there was a brief by *John J. Burke, Terrence J. Gaffney* and *Burke & Schoetz* of Milwaukee, and oral argument by *John J. Burke*.

For the respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J. The complainant, Eli Godfried, applied for a job as a taxicab driver with Boynton Cab Company in Milwaukee on June 4, 1974. When Boynton refused to hire him because of his handicap, the congenital lack of the right hand and forearm from about three inches below the elbow, Godfried filed a handicap discrimination complaint with the Department of Industry, Labor and Human Relations.

After a hearing, the department examiner issued recommended findings of fact and conclusions of law that Boynton had discriminated against Godfried on the basis of his handicap in violation of the Wisconsin Fair Employment Act. The examiner recommended that Boynton be ordered to cease discriminating against Godfried, to instate him as a cab driver, and to give him back pay. The hearing examiner's recommendations were adopted in their entirety by the Department of Industry, Labor and Human Relations on April 14, 1977.

Boynton sought judicial review of the department's order, pursuant to ch. 227, Stats., in the Dane County Circuit Court. The circuit court affirmed the department's order. On appeal, the court of appeals, by a divided court, affirmed.[1] This court granted review of the decision of the court of appeals.

The facts underlying this handicap discrimination case are essentially undisputed. Eli Godfried was a twenty-two year old part-time student when he applied for employment as a taxicab driver with Boynton (Yellow) Cab Company in Milwaukee. Godfried is missing his right hand and forearm due to a congenital birth defect. He owns and often uses a prosthetic device.

Godfried has held a valid Wisconsin driver's license since 1972. At the time he applied to Boynton, Godfried's license limited him to operating motor vehicles equipped with an automatic transmission, self-cancelling turn signals, and a wheel spinner. A wheel spinner is an inexpensive knob-like device which attaches to any vehicle's steering wheel. The device rotates freely, enabling the driver to turn the wheel easily with one hand. Godfried carried his own wheel spinner with him for use when he was driving. The cabs operated by Boynton at the time Godfried applied for employment were all

[1] The opinion of the court of appeals dated October 31, 1978, was unpublished pursuant to Rule 809.23(2).

equipped with automatic transmissions and self-cancelling turn signals.

Prior to applying for employment at Boynton, Godfried worked part-time for two Milwaukee cab companies for a combined period of approximately nine months. Neither company received any complaints about Godfried's driving, although the record contains evidence that at least one prospective customer refused to ride with Godfried when she noticed his handicap. Godfried left the employ of both companies for reasons unrelated to his handicap or the ability to perform adequately the work of a cab driver.

Godfried had been involved in two minor car accidents, neither of which was his fault, during the two years he held a driver's license before applying to Boynton for work. One of the accidents occurred while he was driving a cab.

Boynton concedes that it refused to hire Godfried as a cab driver solely because of his handicap. Because of the high degree of care required of a common carrier transporting passengers and because of the company's fear of civil liability, Boynton had adopted an unwritten policy against hiring one-handed drivers. Although the company granted Godfried a personal job interview, it made no attempt to test Godfried's physical ability to perform the duties of a cab driver.

Boynton admits that, in the absence of sec. 111.32 (5) (f), Stats. (1973),[2] its failure to hire Godfried be-

---

[2] This section was repealed and recreated by ch. 275, sec. 18, Laws of 1975, effective May 27, 1976. The amended section now provides in relevant part that:

"111.32 (5) (f)   It is discrimination because of handicap:

"1. For an employer . . . to refuse to hire . . . any individual . . . unless such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment. . . ."

cause of his handicap would have been an act of unlawful discrimination. That statute provided:

"Sec. 111.32(5)(f). The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. . . ."

Boynton presented the testimony of several witnesses at the initial hearing to prove that its refusal to hire Godfried because of his handicap was lawful under sec. 111.32(5)(f), Stats. Boynton's vice president testified that he had talked with the representative of a Pittsburgh taxicab company at a convention and was told that the other company had once hired a one-handed driver who was later involved in two accidents which could have been avoided had the driver not been handicapped.

Additionally, Boynton subpoenaed a Milwaukee judge to testify at the hearing. He stated that, if a personal injury action came before him involving a one-handed taxicab driver, he would instruct the jury that, as a matter of law, the cab company by hiring such driver had

The effective date of this new provision fell between the date the hearing examiner issued his recommendations in this case and the date the department issued its final order. The Dane County Circuit Court held that the amended version applied to this situation. Both Boynton and the department disagree. The court of appeals found it was immaterial, because the same result would be reached under either version.

Because Godfried's right of action accrued under the 1973 provision in effect at the time Boynton allegedly discriminated against him, the subsequent change in the statutory language is inapplicable. *Dairy Equipment Co. v. DILHR*, 95 Wis.2d 319, 331, 332, 290 N.W.2d 330 (1980); *Bucyrus-Erie Co. v. DILHR*, 90 Wis.2d 408, 419 n. 4, 280 N.W.2d 142 (1979); *see also* sec. 990.04, Stats. All references in the balance of this opinion to sec. 11.32 (5)(f) are to the 1973 statutes.

not exercised the requisite high degree of care imposed on a common carrier.

Boynton also presented evidence at the hearing that the company was a self-insurer but that it had contracts of reinsurance for liability over $25,000. The policy application with the company's reinsurer included a specific question asking whether any of the company's drivers had a physical deficiency or impairment. An employee of the reinsurer testified that insurance companies generally charge higher premiums for handicapped drivers because of a higher loss ratio involving such drivers. However, Boynton did not attempt to prove at the hearing, and does not contend on appeal, that hiring Godfried would have increased its insurance rates.

Boynton also referred the hearing examiner to a Wisconsin statute and two federal regulations which the company claimed justified its refusal to hire Godfried. The state statute, sec. 343.12 (2) (f) Stats. (1973), prohibits the operation of a school bus in Wisconsin by a driver who does not have the use of both hands. The company also relied heavily, and essentially justified its hiring policy, on 49 C.F.R. secs. 391.41 and 391.49 of the Federal Motor Carrier Safety Regulations, which provide, in essence, that a person is not physically qualified to drive a motor vehicle carrying passengers for a motor carrier engaged in interstate commerce if the person lacks the use of a hand or arm. Although Boynton introduced some evidence that it carried customers across the state line into Illinois on an average of twice a week, the company conceded that the federal regulations did not specifically apply to its operation.

The opinion of the court of appeals held that the record contained no credible evidence that Godfried would be unable to satisfactorily perform the duties required of a Boynton cab driver. The majority opinion refused

to accept, without proof, the idea that one-handed persons were, as a class, incapable of safely operating taxicabs. The opinion found that Boynton failed to prove that there was a causal relationship between Godfried's handicap and his inability to drive taxicabs, and, although Boynton may promulgate and enforce legitimate driver standards, that it must individually test each applicant against the standards.

The concurring opinion rejected the trial court's rationale that handicapped job applicants must be considered upon their individual abilities rather than the generalized ability of similarly handicapped persons because the foundation question under either an individual approach or a general approach is whether the employer has established that the discrimination was lawful.

The concurring opinion stated that the federal regulations were the only relevant evidence produced by Boynton and must be accorded some weight in determining whether Boynton's rationale for barring one-handed drivers from its employ was reasonable. The concurrence stated that it could not agree with the lead opinion that the regulations were inapplicable and also disagreed with the dissent that the federal regulations alone were determinative of the issue. The concurrence viewed the question as whether those regulations standing alone were sufficient to meet the employer's burden to prove that its discrimination against one-handed drivers was lawful. Concluding that such regulations were not sufficient, because they were promulgated to protect the public from dangers other than, or additional to, those to which passengers in taxicabs are subject, it agreed with the principal opinion that Boynton had not met its burden of proof.

The dissenting opinion reasoned that Boynton should be entitled to rely on driver qualifications established by the Federal Highway Administration, the federal agen-

cy entrusted with regulating the safety of motor carriers. The dissenting judge contended that it was reasonable for Boynton to rely on the physical qualifications of drivers established by the federal agency, regardless of whether the cab company was required to comply with those qualifications.

The basic question on this appeal is whether Boynton Cab Company's refusal to hire a one-handed cab driver because he did not meet the physical standards set by the company constitutes discrimination against a handicapped person prohibited by secs. 111.31–111.36, Stats. (1973). We conclude that it did not constitute prohibited discrimination, and therefore we reverse.

To answer the basic question, however, two other issues are posed: Did the department, the circuit court, and the court of appeals err in imposing upon Boynton the burden of proving to a "reasonable probability" that its rule against employing one-handed drivers was necessary in light of its acknowledged safety obligations as a common carrier. We conclude that an erroneous burden was imposed and the proper burden to be borne by Boynton was to show that its hiring standard bore a rational relationship to the safety obligations imposed upon a common carrier of passengers and that the standard used by Boynton was not the result of an arbitrary belief lacking in objective reason or rationale. The final question is whether that burden of proof was satisfied by reliance upon federal standards involving the federal motor carrier safety regulations. We conclude that the appropriate burden was satisfied by utilization of the federal standards.

On judicial review pursuant to ch. 227, Stats., an agency's findings are conclusive if made on a rational basis and supported by substantial evidence. Sec. 227.20, Stats.

(1973) ; *see also, Holtz & Krause, Inc. v. Department of Natural Resources,* 85 Wis.2d 198, 204, 270 N.W.2d 409 (1978) ; *Westring v. James,* 71 Wis.2d 462, 475–77, 238 N.W.2d 695 (1976) ; *DeGayner & Co. v. Department of Natural Resources,* 70 Wis.2d 936, 236 N.W.2d 217 (1975). Substantial evidence has been defined to be that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. *Beloit Education Asso. v. Employment Relations Comm.,* 73 Wis.2d 43, 70, 242 N.W.2d 231 (1976) ; *see also, Copland v. Department of Taxation,* 16 Wis.2d 543, 554, 114 N.W. 2d 858 (1962). Stated another way, judicial review under ch. 227 is limited to whether the evidence was such that the agency might reasonably make the finding that it did. *Sanitary Transfer & Landfill, Inc. v. Department of Natural Resources,* 85 Wis.2d 1, 270 N.W.2d 144 (1978) ; *Robertson Transportation Co., Inc. v. Public Service Comm.,* 39 Wis.2d 653, 658, 159 N.W.2d 636 (1968).

In reviewing a circuit court order reversing or modifying an order of an administrative agency, an appellate court's scope of review is identical to that of the circuit court. *Scharping v. Johnson,* 32 Wis.2d 383, 145 N.W. 2d 691 (1966). Findings of fact shall be set aside if not supported by substantial evidence in the record. Sec. 227.20(1)(d), Stats. (1973). Questions of law, including the construction, interpretation, or application of a statute, are reviewable *ab initio.* Sec. 227.20(1)(b), Stats. (1973) ; *see also, Milwaukee County v. DILHR,* 80 Wis.2d 445, 455, 259 N.W.2d 118 (1977) ; *Department of Revenue v. Milwaukee Refining Corp.,* 80 Wis.2d 44, 48, 257 N.W.2d 855 (1977) ; *Pabst v. Department of Taxation,* 19 Wis.2d 313, 322, 120 N.W.2d 77 (1963). Although sec. 227.20(2), Stats. (1973), provides that due weight will be accorded the experience, technical

competence, and specialized knowledge of the administrative agency involved, no special deference is required when this court is as competent as the administrative agency to decide the legal question involved. *Department of Revenue v. Milwaukee Refining Corp., supra* at 48; *Wisconsin Dept. of Revenue v. A. O. Smith Harvestore Products, Inc.,* 72 Wis.2d 60, 65–6, 240 N.W.2d 357 (1976) ; *Pabst v. Department of Taxation, supra* at 323–24.

There are three points essential to establishing that a person has been discriminated against in regard to employment due to a handicap: (1) The complainant must be handicapped within the meaning of the Fair Employment Act (FEA) ;[3] (2) the complainant must establish that the employer's discrimination was on the basis of handicap ;[4] and (3) it must appear that the employer cannot justify its alleged discrimination under the exception set forth in sec. 111.32(5)(f), Stats. Only the latter point is at issue in this case, because Boynton concedes that Godfried is handicapped and that the company's refusal to hire him would be a violation of the FEA were it not justified under sec. 111.32(5)(f).

The pertinent inquiry under this statute is whether Godfried's handicap rendered him "physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job." The department resolved this issue in Godfried's favor, finding as a fact that:

". . . no credible evidence exists that the Complainant would be unable to satisfactorily perform at the stan-

---

[3] For an extensive discussion of what constitutes a handicap under the FEA, *see, Dairy Equipment Co. v. DILHR, supra; Chicago, M., St. P. & P. RR. Co. v. DILHR,* 62 Wis.2d 392, 396, 215 N.W.2d 443 (1974).

[4] *See, Chicago, M., St. P. & P. RR. Co. v. DILHR, supra.*

dards set by the employer the duties required in the job of cab driver."

Findings of an administrative agency are ordinarily entitled to deference on review. *See, e.g., Bucyrus-Erie Co. v. DILHR, supra,* 90 Wis.2d at 416–20. This rule of review is inapplicable, however, where, as here, the factual finding is based entirely on uncontroverted evidence. Where the evidence is undisputed and the credibility of witnesses is not in issue, this court is in as good a position as the agency to make findings of fact. *Department of Revenue v. Milwaukee Refining Corp.,* 80 Wis.2d 44, 257 N.W.2d 855 (1977); *Wisconsin Dept. of Revenue v. A. O. Smith Harvestore Products, Inc.,* 72 Wis.2d 60, 240 N.W.2d 357 (1976).

The only relevant evidence presented by Boynton to justify its refusal to hire Godfried was the federal motor carrier safety regulations.[5] In both its brief on appeal and its oral argument, Boynton relied almost exclusively on the federal regulations. The only question on review, therefore, is whether these federal regulations, standing alone, are sufficient to meet Boynton's burden of proof under the FEA.

Once Godfried demonstrated that he was refused employment because of his handicap, the burden of proof shifted to Boynton to justify its action under sec. 111.-

[5] The insurance agent's testimony that the insurance industry felt that handicapped persons had a higher loss-ratio than unhandicapped persons was, in addition to being hearsay, immaterial. The county judge's opinion that Boynton would be negligent, as a matter of law, if it hired Godfried and he got in an accident, was an incorrect statement of law under *Lisowski v. Milwaukee Auto. Mut. Ins. Co.,* 17 Wis.2d 499, 507, 117 N.W.2d 666 (1962). The requirement in sec. 343.12(2)(f), Stats., that Wisconsin school bus drivers must have the use of both hands is not persuasive given the differences between taxis and school buses and the special protection given school children.

32(5)(f), Stats. *Chicago, M., St. P. & P. RR. Co., supra.*
Boynton then had the burden of showing that Godfried
was physically unable to efficiently perform the duties
of a cab driver at the standard set by Boynton. This
burden of proof encompasses two analytically distinct
points: (1) Was Godfried physically able to perform the
duties of a Boynton cab driver; and (2) would hiring
Godfried be hazardous to the safety of passengers, other
drivers, or the public; and, if so, would hiring such a
driver violate the high standard of care required of
Boynton as a common carrier.

Boynton made no attempt in this case to prove by test
or testimony that Godfried was physically unable to
perform the duties of a cab driver. The undisputed fact
that Godfried had worked approximately nine months
without complaint as a Milwaukee cab driver before ap-
plying to Boynton implies that he was physically able
to perform the work. Although this point was not con-
tested by Boynton, the department, the trial court, and
the majority opinion of the court of appeals all focused
on the absence of subjective proof that Godfried was
physically unable to drive a cab satisfactorily. This
focus misses the point in the context of this case.

Boynton's justification throughout this case for not
hiring Godfried has been that its blanket rule against
hiring one-handed drivers is rational and reasonably
necessary to satisfy the company's safety obligations as
a common carrier of passengers. The company argues
that it would be unrealistic and unreasonable to compel
individual testing of every handicapped job applicant
when it can look instead to federal regulations which es-
tablish minimum safety standards for passenger-carry-
ing operations.

In rejecting Boynton's argument, the department and
the courts below emphasized that Boynton failed to prove
to a "reasonable probability" that hiring Godfried would

pose a safety hazard. Placing the rigorous "reasonable probability" burden of proof on the employer finds support in recent cases.

In *Bucyrus-Erie Co. v. DILHR, supra* at 90 Wis.2d 424, the court described the burden of proof on the employer to come under the sec. 111.32(5)(f), Stats., exception:

"If the evidence shows that the applicant has a present ability to physically accomplish the tasks which make up the job duties, the employer must establish to a *reasonable probability* that because of the complainant's physical condition, employment in the position sought would be hazardous to the health or safety of the complainant or to other employees or frequenters of the place of employment." (Emphasis supplied.)

This standard was quoted with approval in *Chicago & N.W. R. R. v. Labor & Industrial Review Comm.,* 91 Wis.2d 462, 468, 283 N.W.2d 603 (Ct. App. 1979); *see also, Dairy Equipment Co. v. ILHR Department, supra* (at 332, 333); *cf., Chicago, M., St. P. & P. RR. Co. v. DILHR, supra* at 398–99, requiring the employer to establish "to a reasonable degree of medical certainty" that hiring the handicapped complainant would be hazardous.

If Boynton's actions are to be measured against this heavy burden, which implies individual testing of a job applicant, we would be obliged to affirm. This burden is, we conclude, incorrect under sec. 111.32(5)(f), Stats., for evaluating a common carrier's safety-based hiring standards.

The court recognized in *Bucyrus-Erie* that "the ability to perform work safely is one aspect of efficient performance of a particular job and therefore could reasonably be included in work standards set by an employer." 90 Wis.2d at 421. Confronted by an absence of pertinent Wisconsin law, the *Bucyrus-Erie* court ex-

amined federal employment discrimination cases.[6] The cases cited and discussed by the court in *Bucyrus-Erie* all involved common carriers, in which the employer was either a bus or an airline company.

As discussed in greater detail below, the federal cases uniformly hold that common carriers of passengers have a significantly lighter burden than do other employers to justify enforcing safety-based employment standards. After discussing and tacitly approving of the special common carrier standard, this court nevertheless placed the "reasonable probability" burden on the non-common carrier employer.[7] In so doing, however, the court stated:

"Obviously the high standards recognized for certain employees in the common carrier industry are not applicable to a welder at Bucyrus-Erie. The point is that we believe safety with regard to both the handicapped employee's future health and well-being and others is a factor to be accorded some recognition in cases arising under sec. 111.32(5)(f), Stats. 1973. The ability to efficiently perform embraces more than the physical strength and dexterity required to adequately perform at the moment of application for employment. It embraces the ability to perform without a materially enhanced risk of death, or serious injury to the employee or

---

[6] The *Bucyrus-Erie* court noted that the court has looked to federal decisions before for guidance in applying Wisconsin's FEA. 90 Wis.2d at 421 n. 6.

[7] None of the Wisconsin cases heretofore have involved directly the factual question addressed by the federal courts of whether a common carrier's high safety obligations require imposing a less rigorous burden of proof on the employer to justify an allegedly discriminatory employment standard. Because of their factual posture, the Wisconsin cases have evidenced a primary concern with the complainant's ability to perform the work adequately and without undue danger to the complainant, rather than concern that the complainant's handicap could be hazardous to third parties. It is apparent that Boynton's expressed concern is in respect to the safety of other persons, not the employee.

others in the future and the statute must be so construed. We do not believe that the legislature when proscribing discrimination against those physically handicapped intended to force an employer into the position of aiding a handicapped person to further injury, aggravating the intensity of the handicap or creating a situation injurious to others. Such an interpretation would compromise not only the best interests of the handicapped but all concerned." 90 Wis.2d at 423.

This court has thus clearly recognized that the burden of proof imposed upon a common carrier is a lesser one than that imposed in *Bucyrus-Erie*. It is apparent that the "reasonable probability" burden is incorrect in the present case.

The unique interest of common carriers in promoting driver safety was analyzed recently in two federal cases arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. sec. 621, an act similar in structure and general purpose to Wisconsin's FEA. *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976) ; *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir. 1974), *cert. den.*, 419 U.S. 1122. To survive an initial showing of discrimination, the federal act requires the employer to demonstrate that the challenged employment standard is a bona fide occupational qualification (BFOQ). Both cases involved bus company policies against hiring persons to be intercity drivers if they were over a specified age—forty in the case of *Tamiami;* thirty-five in the case of *Greyhound.* The courts sustained the policies in each case as BFOQ's *reasonably related to the carrier's interest in hiring safe drivers.*

The Fifth Circuit stated the following rule for testing the reasonableness of a common carrier's safety-based qualifications :

"The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm

in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." *Usery, supra,* 531 F.2d at 236.

In *Hodgson,* the trial court had held that Greyhound's age qualification was unlawful discrimination because the company failed to prove that " 'all or substantially all [applicants over age 40] . . . would be unable to perform safely and efficiently the duties of the job involved.' " 499 F.2d at 861. The Seventh Circuit rejected the trial court's individualized approach and, in upholding Greyhound's safety-based age qualification, set a less onerous burden for justifying a common carrier's BFOQ. In the court's words:

". . . a public transportation carrier, such as Greyhound, entrusted with the lives and well-being of passengers, must continually strive to employ the most highly qualified persons available for the position of intercity bus driver for the paramount goal of a bus carrier is safety. Due to such compelling concerns for safety, it is not necessary that Greyhound show that all or substantially all bus driver applicants over forty could not perform safely. Rather, to the extent that the elimination of Greyhound's hiring policy may impede the attainment of its goal of safety, it must be said that such action undermines the essence of Greyhound's operations. Stated differently, *Greyhound must demonstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers. Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice."* (Emphasis supplied.) 499 F.2d at 863.

Hence, the federal courts have required only that the hiring rule have a rational relationship to the likelihood that the elimination of the hiring restriction might increase the risk of harm to passengers.

Federal courts have applied the same or similar burdens of proof in cases involving other types of common carriers and personnel positions although the correlation between safety and personnel qualification might vary.[8] Moreover, in addition to recognizing a lighter burden of proof for common carriers attempting to justify employment standards, these same cases reject the argument advanced by the department in the present case that a handicapped person's ability to perform the required work must be individually tested. For example, in *Hodgson,* the Seventh Circuit dismissed the need for individualized testing of every over-age bus driver applicant with the following observation:

"Greyhound need not establish its belief to the certainty demanded by the Government and the district court for to do so would effectively require Greyhound to go so far as to experiment with the lives of passengers in order to produce statistical evidence pertaining to the capabilities of newly hired applicants forty to sixty-five years of age. Greyhound has amply demonstrated that its maximum hiring age policy is founded upon a good faith judgment concerning the safety needs of its passengers and others. *It has established that its hiring policy is not the result of an arbitrary belief lacking in objective reason or rationale.*" (Emphasis supplied.) 499 F.2d at 865.

The Seventh Circuit recently reaffirmed this position in *Starr v. Federal Aviation Administration,* 589

---

[8] *See, e.g., Monnier v. United States Department of Transportation,* 465 F. Supp. 718 (E.D. Wis. 1979) (diabetic truck driver); *Starr v. Federal Aviation Administration,* 589 F.2d 307 (7th Cir. 1978) (over-age pilot); *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50 (8th Cir. 1977) (pilot); *Harriss v. Pan Am. World Airways, Inc.,* 437 F. Supp. 413 (N.D. Calif. 1977) (pregnant flight attendant); *Condit v. United Air Lines, Inc.,* 558 F.2d 1176 (4th Cir. 1977) (pregnant stewardess); *Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385 (5th Cir. 1971, *cert. den.,* 404 U.S. 950 (1971) (rule prohibiting male flight attendant)).

F.2d 307 (7th Cir. 1978). *Starr* involved a United Air Lines pilot who, upon turning sixty, sought exemption from the F.A.A.'s "Age 60 Rule," 14 C.F.R. sec. 121.383 (c) (1977), prohibiting persons over sixty from serving as pilots. The rule "was promulgated primarily to protect against the risk of a pilot's sudden incapacitation in flight from heart attack or stroke." 589 F.2d at 309.

Starr introduced medical testimony which indicated that his excellent physical condition warranted an exemption. The F.A.A. nevertheless refused Starr an exemption and reaffirmed its support of the "Age 60 Rule."

The appeal centered on whether the F.A.A. could refuse exemptions for a particular class of persons without individualized testing. Acknowledging that the "Age 60 Rule" was a proven BFOQ, the court reviewed and upheld the F.A.A.'s action under an abuse of discretion standard. The court reasoned that it would be too burdensome and speculative to individually evaluate exemption petitions. The court concluded that, if the rule was reasonable, it was "not abuse of discretion to reject any individual application for exemption even if the applicant demonstrates that he personally is a superman immune from the impairments that age normally inflicts." 589 F.2d at 312–13. Although *Starr* was decided under an abuse of discretion standard in respect to the formulation of a mandatory rule, a standard inapplicable to the present case, the decision demonstrates that, for safety reasons, a common carrier of passengers may enforce a reasonable class-based rule without individual testing.

A similar result was reached by a three-judge panel of the Eastern District of Wisconsin in *Monnier v. U. S. Dept. of Transportation, supra.* Monnier was discharged as an interstate truck driver pursuant to 49 CFR sec.

391.41 (b) (3) of the Motor Carrier Safety Regulations. These regulations provide that a person having a history or clinical diagnosis of diabetes requiring insulin for control is unqualified to drive certain types of vehicles in interstate commerce.

Monnier claimed that his exemption petition should have been examined on an individual basis. In support of this point he introduced statements from doctors that diabetes should not be an absolute bar to such driving and an affidavit stating that he had driven a truck in interstate commerce at least 100,000 miles a year for five years with no diabetes-related disability.

Relying heavily on *Starr*, the court rejected Monnier's individualized testing argument and focused instead on whether the Federal Highway Administration abused its discretion by enacting the diabetes rule. The court noted that, in granting the Interstate Commerce Commission regulatory authority, Congress had directed it " 'to promote the safety of operation and equipment of motor vehicles.' " *Monnier, supra*, 721. The court went on to uphold the rule, noting that it was rationally based on safety considerations.

Under the Seventh Circuit's reasoning in *Hodgson*, Boynton's burden is to establish that its policy against hiring one-handed drivers was "not the result of an arbitrary belief lacking in objective reason or rationale." 499 F.2d at 865. Boynton's challenged policy is based on the belief that one-handed cab drivers would be less safe than two-handed drivers. For Boynton's policy to be reasonable and thus lawful, "it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." 499 F.2d at 863. The legal question, therefore, is whether the federal motor carrier safety regulations relied upon by Boynton satisfy this burden.

It is beyond dispute that Boynton is a common carrier, and as such, owes a duty to its passengers " 'to exercise the highest degree of care reasonably to be expected from human vigilance and foresight, in view of the character of the conveyance adopted and consistent with the practical operation of the business.' " *Dauplaise v. Yellow Taxicab Co.*, 204 Wis. 419, 422, 235 N.W. 771 (1931). *See also, Scales v. Boynton Cab Co.*, 198 Wis. 293, 223 N.W. 836 (1929) ; *Anderson v. Yellow Cab Co.*, 179 Wis. 300, 191 N.W. 748 (1923). Boynton argues that its policy against hiring one-handed drivers is necessary to satisfy this high standard of care and cites certain federal regulations as evidence that its standard is reasonably calculated to promote safety. These regulations are part of the Federal Motor Carrier Safety Regulations promulgated by the Federal Highway Administration, 49 CFR sec. 390 *et seq.*

The Federal Highway Administration's driver qualifications are "minimum qualifications for persons who drive motor vehicles . . . on behalf of motor carriers" and expressly recognize that an employer may institute additional or more stringent qualifications. 49 CFR sec. 391.1(a) and (b). The drivers to whom the rules apply include those operating vehicles such as taxis having a seating capacity of ten or less engaged in transporting passengers for hire. Sec. 391.2(b). Boynton relies on sec. 391.41(b), which provides:

"A person is physically qualified to drive a motor vehicle if he—
"(1) Has no loss of a foot, a leg, a hand, or an arm, or has been granted a waiver pursuant to sec. 391.49."

Drivers engaged in transporting passengers or hazardous materials are precluded from seeking individual exemptions from the above rule. Sec. 391.49. Despite this absolute bar, the provision has not been challenged in the courts under the Federal Rehabilitation Act of

1973, 29 U.S.C.S. sec. 701 *et seq.*, which forbids handicap discrimination and requires employers covered by the act to attempt to accommodate handicapped persons.

Boynton concedes that the rules do not apply to its "intracity operations,"[9] sec. 391.2(a), but argues that it is reasonable for a common carrier to rely on driver physical standards established by the federal agency responsible for regulating motor carrier safety, regardless of whether the rules mandatorily govern its operations. Boynton notes that notwithstanding the Rehabilitation Act of 1973 the motor carrier safety regulations were recently revised to provide even stricter physical standards for intercity drivers.

The revised physical standards were published December 5, 1978. 43 F.R. at 56900. 49 CFR sec. 391.41 (b) now provides that:

"(b)  A person is physically qualified to drive a motor vehicle if that person—
"(1)  Has no loss of a foot, a leg, a hand, or an arm, or has been granted a waiver pursuant to sec. 391.49;
"(2)  Has no impairment of:
"(i)  A hand or finger which interferes with prehension or power grasping; or
"(ii)  An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a motor vehicle; or has been granted a waiver pursuant to sec. 391.49."

The official comment accompanying this revision explains that it was designed to assist medical examiners in determining whether a particular physical impairment interferes with operating a motor vehicle safely and whether an exemption is warranted. 43 F.R. at 56900. Although the exemption provision was also revised, with

---

[9] "Intracity" is defined as "wholly within a municipality, or the commercial zone thereof." 49 CFR 390.16.

particular attention directed at the needs of the handicapped, *sec. 391.49 (1978) continues to exclude from the exemption provision drivers engaged in transporting passengers or hazardous materials.*

The revision of the physical qualifications set forth in sec. 391.41 (b) and, in particular, the addition of the requirements in 2 (i) and (ii) undermines the persuasiveness of the concurring court of appeals opinion. In dismissing the reasonableness of Boynton's exclusive reliance on the federal regulations, the concurring opinion of the court of appeals noted that the regulations were applicable to a wide variety of vehicle types, the drivers of which may "have numerous duties other than the safe operation of the vehicle." (slip op. at 7). The concurrence reasoned that:

"The performance of these additional duties—such as loading and securing bulk goods, coupling and uncoupling combination units, manipulating gears and machinery— may well require the use of two hands."

The revised rules, however, make clear that the pertinent focus is on whether the handicap "interferes with the ability to perform normal tasks associated with operating a motor vehicle." Stated another way, the focus is on the driver's ability to drive, not his ability to perform ancillary tasks. Boynton's reliance on the regulations concerns Godfried's ability to drive safely, not his ability to open car doors, carry luggage, or operate the dispatcher radio while driving.

We conclude that the utilization of the federal regulations as a hiring standard, although not mandatorily imposed upon Boynton, demonstrated a rational relationship to the safety obligations imposed upon a common carrier of passengers, and its use as a guideline was not the result of an arbitrary belief lacking in objective reason or rationale. The uncontested proof that Boynton

relied upon this federal safety standard satisfied its appropriate burden of proof.

The department's final argument is that Boynton's failure to establish the factual basis upon which the federal regulations are based and to prove that the federal agency's rules are reasonable render the company's reliance on the regulations unjustified. The department offers no authority for the proposition that this court should impose the burden on Boynton of proving that the Federal Highway Administration's regulations are themselves reasonable. The Supreme Court stated, that in reviewing regulations issued under the Interstate Commerce Act, the statute under which 49 CFR sec. 391.-41 (b) was promulgated:

"We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported." *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 747 (1972). Quoted with approval, *Monnier, supra,* at 723.

Given the high degree of care required of common carriers and the acknowledged expertise of the federal agency upon whose regulations Boynton relies, it seems clear that the rule is both rational and reasonably tailored to advance safety considerations.

Boynton has satisfied the burden of proof necessary under sec. 111.32 (5) (f), Stats., to establish that the refusal to hire Godfried on the basis of the guidelines established by the federal regulations did not constitute discrimination prohibited by the Fair Employment Act.

*By the Court.*—Decision of the court of appeals reversed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. The majority opinion carries the reader along step by step, case by case, to a conclusion which I think is inconsistent with the cases upon which the majority relies.

The majority imposes on Boynton a minimal burden to justify its unwritten rule that it will not hire persons who have the use of only one arm. "The burden to be borne by Boynton," states the majority, "was to show that its hiring standard bore a rational relationship to the safety obligations imposed upon a common carrier of passengers and that the standard used by Boynton was not the result of an arbitrary belief lacking in objective reason or rationale." The majority says that for Boynton's rule to be reasonable and lawful "it is enough [for Boynton] to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." No lighter burden for Boynton could be devised. Yet Boynton does not offer evidence to meet this burden. All that Boynton does show is the existence of a Federal Highway Administration regulation requiring that drivers of certain vehicles have the use of two arms.

The majority concedes that the Federal Highway Administration regulation is the only relevant evidence Boynton produces to show that its hiring standard bears a rational relationship to its safety obligations. The majority concludes that the very existence of this federal regulation means that there is a rational relationship between Boynton's hiring rule and safety. The very existence of this federal regulation is apparently sufficient, in the majority's view, to show that eliminating the requirement that a driver have the use of two arms *might* jeopardize the life of *one* more person. The majority reaches this conclusion reasoning that "given the high degree of care required of common carriers and the

acknowledged expertise of the federal agency upon whose regulations Boynton relies, it seems clear that [Boynton's] rule requiring drivers to have two arms is both rational and reasonably tailored to advance safety considerations.' The majority offers no authority or further explanation for this proposition.

It is not clear to me why the majority believes that Boynton's hiring rule is rational and reasonably tailored to safety considerations just because a federal agency has a regulation on its books which is not applicable to Boynton. The majority's conclusion becomes especially unclear in view of the fact that the majority opinion places heavy reliance on decisions of federal courts in which the federal courts did not presume the validity of the particular federal regulations in issue in those cases but rather reviewed the evidence on which the particular regulations were based to determine whether the regulations were "rationally supported," or were "rationally based on safety considerations." *See United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, quoted at p. 419 of the majority opinion; *Monnier v. U.S. Dept. of Transportation* (E.D. Wis. 1979), p. 415 of majority opinion. Thus the majority opinion gives greater deference to a Federal Highway Administration regulation, which is not binding on Boynton or on this state, than federal courts give to federal regulations which are intended to be binding on the parties before the federal courts.

This court is not obligated to accept the Federal Highway Administration regulation on face value. Federal and state agencies have been known to err. The federal court decisions relied upon by the majority illuminate the majority's error in failing to require Boynton to show that the federal regulation was rationally based on safety considerations.

In *Monnier,* which the majority cites, the employment of a diabetic interstate truck driver was terminated pursuant to federal regulations prohibiting diabetics from driving. The driver challenged the regulations. Judge Warren of the Eastern District Federal Court of Wisconsin noted that the Federal Highway Administration reports on which the driver regulations were based discussed the relationship of the disease to the specific work environment of the interstate truck driver and summarized recent studies indicating a significantly higher accident risk for diabetic drivers versus the general public. The district court judge further noted that the Federal Highway Administration had solicited comments on a draft of the regulations relating to diabetics and that the American Diabetic Association supported the regulation. In *Monnier,* the court did not presume that a regulation of the Federal Highway Administration was valid; the court reviewed the evidence upon which the agency promulgated the regulation and concluded that the regulation was a rational safety rule, stating:

"In viewing the question of whether the diabetes rule is rationally based, this Court is led to review the evidence submitted to the administrative agency. Although there were comments submitted to the Federal Highway Administration recommending a liberalization of the rule, the agency's determination, as indicated by the reports of groups such as the American Diabetes Association, is not without support. Furthermore, in commenting upon the evidence submitted to the Federal Highway Administration, the Administration indicated that the reports of many of the proponents of the present rule were supported with documentation and as such were given more weight in the final determination. . . ."

To uphold Boynton's hiring rule, this court has to resort to a "presumption" that the Federal Highway Administration regulation is a rational safety rule, because the record in this case and the law books and material available to the majority are devoid of any evidence or

any rationale upon which the Federal Highway Administration based its regulation. Thus this court, unlike the federal court in *Monnier,* cannot determine whether the federal regulation was "rationally supported" or "rationally based on safety factors" and whether the application of the federal regulation to Boynton, an intra-city taxi-cab company, is a rational safety measure. As Judge Bablitch of the court of appeals pointed out, the reasonableness of the federal regulation in question has never been judicially tested and it is not clear that it could survive a test against the legislative mandate that the handicapped are to be integrated into the work force unless it is demonstrated that they are unable to perform a given job. If this court were going to apply a presumption, it ought to presume that because Godfried is fully licensed and qualified to drive a cab under Wisconsin law, he *is* competent to drive a cab.

The majority opinion leaves the reader with the impression that somehow it is unfair to ask Boynton to show that it has "a rational basis in fact to believe" that elimination of its rule would jeopardize the well-being of one more person. The majority opinion leaves the reader with the impression that somehow it is unfair to ask Boynton to show that the Federal Highway Administration regulation is rationally based on safety considerations and that non-adherence to the regulation "will increase the likelihood of risk of harm to its passengers." I do not think it is unfair to ask Boynton to furnish support for a hiring rule which on its face appears to be a discriminatory stereotypical rule.

I think the reader's impression that it would be unfair to ask Boynton to justify its rule comes from the majority's repeatedly saying "Boynton relied upon this federal safety standard." The majority opinion (pp. 418, 419) states that "The uncontested proof that Boynton relied upon this federal safety standard satisfied its appro-

priate burden of proof." The impression left with the reader by such statements in the majority opinion is that Boynton, before adopting its unwritten hiring rule, carefully explored the question of hiring one-armed drivers, studied the federal regulations, and then, relying on the expertise of the Federal Highway Administration and its regulation, concluded that safety considerations mandate that it adopt a rule not to hire drivers who have the use of only one arm. But Boynton never claims that this is how its rule evolved.

The Vice President of Boynton in charge of claims and personnel, who had been with the Boynton Cab Company for forty-nine years, testified several times that the sole basis for the company's policy of not giving a one-armed person an application form for a job and of not hiring such a person under any conditions, was because the company "was afraid to put him on because of the responsibility and the highest degree of care and that with a man with one arm, we couldn't win a case [in court] if we were 100 percent right." Neither the Vice President of Boynton nor any other officer or employee of Boynton testified that Boynton relied on the federal regulation or any statistical or medical information in developing its hiring rule. The company was concerned only about whether it could win a lawsuit, if an accident occurred. Boynton has no one-armed drivers and had 350 accidents during 1975.

The federal regulation was introduced by Boynton's counsel as part of Boynton's legal argument to support its position that its hiring rule is rationally related to safety. Boynton's counsel introduced the regulation at the end of the hearing, asking the Department of Industry, Labor & Human Relations and the courts "to take judicial notice" of the regulation, asking the Department and courts to rely on the federal regulation as constituting the necessary link or the rational relationship between Boynton's hiring rule and Boynton's safety obli-

gations. It is not Boynton that relied with blind faith on the federal regulation in adopting its hiring rule. It is this court which relies with blind faith on the federal regulation in concluding that there is a rational relationship between Boynton's hiring rule and Boynton's safety obligations.

It is undisputed that Godfried was denied employment as a driver because of his physical handicap. It is also undisputed that there was no medical or statistical or other factual evidence to establish that Godfried himself was incompetent to drive a cab or to establish that Boynton had a rational basis in fact to believe that hiring one-armed drivers "might jeopardize the life of one more person than might otherwise occur" or might "increase the risk of harm to the well-being of its passengers and others."

Because Boynton Cab Company failed to meet the very minimal burden which the majority places on it, I would affirm the decision of the court of appeals.

I am authorized to state that Justice Roland B. Day joins in this dissent.