Donald LEWIS, Director, Department of Human Rights, ex rel. George R. WELLES, complainant, Appellant,

v.

METROPOLITAN TRANSIT COMMISSION, Respondent.

No. 51741.

Supreme Court of Minnesota.

June 11, 1982.

Edward P. Starr, City Atty., and Frank E. Villaume III, Deputy City Atty., St. Paul, for appellant.

O'Connor & Hannan, Kent E. Richey and David W. Kelley, Minneapolis, for respondent.

WAHL, Justice.

Donald Lewis, Director of the St. Paul Department of Human Rights, appeals from the order and judgment of the Ramsey County District Court which dismissed Lewis' petition charging the Metropolitan Transit Commission (MTC) with violation of St. Paul, Minn., Legislative Code § 183.-03(2)(b)–(d) (1981)[1] prohibiting employment discrimination based on physical disability.

The trial court found that George R. Welles, an MTC bus driver, posed a serious threat to the safety of others, that the MTC's requirement of distant visual acuity of at least 20/40 Snellen[2] in each eye is a bona fide occupational qualification for the position of MTC bus driver, and that, therefore, the MTC had not violated the St. Paul Human Rights Ordinance by suspending Welles from his position as a bus driver. The MTC cross-appealed from the trial court's finding that the MTC is subject to the St. Paul Human Rights Ordinance. We affirm.

George Welles, 56 at the time this appeal was taken, was born with a displaced lens and a cataractous cornea in his left eye. While he can perceive light through his left eye and count fingers at 6 to 8 feet, his vision cannot be measured because he cannot read letters on a standard eye chart. This condition is uncorrectable. His right eye is normal and has been measured at 20/25 and 20/20 Snellen. Despite his physical disability, Welles possesses a Class B Minnesota driver's license.[3] He was a professional driver of limousines and taxi cabs between 1949 and 1973 and has driven an MTC bus since 1973.

The MTC, governing body of the Metropolitan Transit Area, is an all-bus transit system with 1,000 vehicles transporting passengers more than 32 million miles each year. At the time of trial, the MTC employed approximately 1,450 bus drivers. In 1979, the MTC received approximately 3,600 applications for driver positions, ultimately hiring 319 drivers. As a precondition to employment, applicants are required to pass a physical examination, as required by the MTC's rules. Rule 6 of the Twin Cities Area Metropolitan Transit Commission states:

> (a) Qualifications: No transit carrier shall allow one of its vehicles to be driven or require any person to drive a vehicle unless the person so driving possesses the following minimum qualifications:
>
> \* \* \* \* \* \*

---

1. St. Paul, Minn., Legislative Code § 183.-03(2)(b)–(d) (1981) is a recodification of the ordinance in effect at the time this action arose; St. Paul, Minn., Legislative Code § 74.03(B)(2)–(4) (1975).

2. The "Snellen" rating essentially is based on what a person perceives on a standard eye chart at a distance of 20 feet. Vision of 20/20 means that a person sees the same symbols at 20 feet as a "normal" person does. Similarly, vision of 20/40 means that a person sees at 20 feet what a "normal" person can see at 40 feet.

3. Minn.Stat. § 171.02, subd. 2(b) (1980) describes the scope of a Class B license and states: "Class B; valid for all vehicles in Class C and all other single unit vehicles including buses."

(5) Shall have successfully passed a physical examination as required by the Department of Transportation Motor Carrier Safety Regulations as adopted in MTC 5.

Rule 5 provides:

To the extent not in conflict with these regulations or Minnesota Statutes, the provisions of the Department of Transportation Motor Carrier Safety Regulations, Parts 290–297, as published in Parts 390–97, Title 49 C.F.R., and amendments thereto, shall also apply to all transit vehicles * * *.[4]

The federal regulations included within the scope of MTC Rules 5 and 6 set forth the minimum vision standards required of federally regulated drivers.

(a) A person shall not drive a motor vehicle unless he is physically qualified to do so * * *.

(b) A person is physically qualified to drive a motor vehicle if that person—

\*     \*     \*     \*     \*     \*

(10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses.

49 C.F.R. § 391.41 (1981).

During routine physical examinations for the MTC, Welles' left eye was measured at 20/100 in 1973 and 20/70 in 1976. The physicians conducting each of these examinations concluded that Welles was qualified to discharge the duties of an MTC bus driver and did not draw the MTC's attention to Welles' nonconforming vision.

On August 10, 1978, Welles underwent another routine physical examination by a specialist in industrial medicine whom the MTC had retained after becoming dissatisfied with the thoroughness of the doctors it had previously employed. This specialist found Welles' vision in his right eye to be 20/25 and not measurable in his left eye and notified MTC management that Welles' vision did not conform to the federal vision standard. The MTC immediately suspended Welles, who requested that he be examined by another opthamologist.

On August 17, 1978, a board-certified opthamologist confirmed that Welles' vision did not meet the federal standard because the vision in his left eye could not be measured and was limited to counting fingers at 6 to 8 feet.

Lewis filed a petition with the St. Paul Human Rights Commission (Commission) on behalf of Welles, alleging that the MTC had unlawfully discriminated on the basis of physical disability against Welles with respect to his employment. The MTC demanded a trial in Ramsey County Court and waived its right to a hearing before the Commissioner. Lewis then filed a petition in Ramsey County District Court, realleging the violation of St. Paul, Minn., Legislative Code § 183.03(2)(b)–(d), which provides:

Except when based on a bonafide occupational qualification, it shall be unlawful

\*     \*     \*     \*     \*     \*

2. For an employer, because of * * * disability

\*     \*     \*     \*     \*     \*

(b) To discharge an employee;

(c) To discriminate against an employee with respect to hire, tenure, apprenticeship, compensation, terms, upgrading, or other conditions or privileges of employment;

(d) To do or to commit any other act * * * which arises out of, or is activated by, considerations of * * * disability.

St. Paul, Minn., Legislative Code § 183.-02, subd. 2 (1981)[5] provides a defense to the charge of employment discrimination based

---

4. Those regulations regulate all nonexempt motor carriers and their drivers. The MTC is exempt from the regulations by reason of 49 C.F.R. § 391.2(a) (1981), which states that the driver qualifications regulations do not apply to a "driver wholly engaged in exempt intra-city operations." However, the MTC has voluntarily adopted those standards.

5. Section 183.02, subd. 3 is the present codification of former St. Paul, Minn., Legislative Code § 74.02 (1975).

on disability: "It is a defense to a complaint or action brought under this chapter that the person bringing the complaint or action suffers from a mental or physical disability which poses a serious threat to the safety of others."

Three issues are raised by the appeal and cross appeal: (1) whether the MTC's hiring and employment practices regarding the physical qualifications of its bus drivers are subject to regulation by the St. Paul Department of Human Rights; (2) whether the trial court's conclusion that Welles posed a serious threat to the safety of others was clearly erroneous; and (3) whether the trial court's conclusion that the MTC's requirement that its drivers have distant visual acuity of at least 20/40 Snellen in each eye is a bona fide occupational qualification was clearly erroneous.

■ 1. We must first determine whether the MTC is subject to the St. Paul Human Rights Ordinance. The MTC argues that it has exclusive and unchallengeable authority to set reasonable requirements of employment pursuant to Minn.Stat. § 473.-449 (1980), which states: "The exercise by the [MTC] of the powers provided in [the Metropolitan Transit Commission Act of 1974] shall not be subject to regulation by or the jurisdiction or control of any other public body or agency, either state, county, or municipal." This argument fails. The Minnesota Human Rights Act provides that unlawful employment discrimination by the state and its departments, agencies and political subdivisions may be challenged by the Minnesota Commissioner of Human Rights. Minn.Stat. §§ 363.01, subds. 7, 15; 363.03, subd. 1 (1980). *See Minnesota Department of Highways v. Minnesota Department of Human Rights*, 308 Minn. 158, 241 N.W.2d 310 (1976), *cert. denied*, 429 U.S. 863, 97 S.Ct. 168, 50 L.Ed.2d 141 (1976). The Minnesota Human Rights Act recognizes a statutory scheme which permits charges of discriminatory employment practices to be brought by either the Minnesota Department of Human Rights or a local commission such as the St. Paul Department of Human Rights. Minn.Stat. §§ 363.01, subd. 24; 363.115; 363.116 (1980). The MTC is not immune from a charge by the St. Paul Department of Human Rights that its employment practices are discriminatory. The trial court properly exercised jurisdiction over this action as brought under the St. Paul Human Rights Ordinance.

■ 2. Appellant contends that the trial court erred in finding that Welles, as an MTC bus driver, posed a serious threat to the safety of others. Minnesota Rules of Civil Procedure 52.01 provides the standard of review: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

The record reflects that Welles received positive reviews of his driving by the MTC; and he had a good driving record, never having been in an accident involving personal injury. Further, appellant contends that, although Welles does not have stereopsis,[6] he has learned to compensate and can judge depth by the size of objects, shadows and long experience in relying on only one eye. At trial, appellant offered the testimony of two board-certified opthamologists who had examined Welles. One, not qualified to offer an opinion as to driver safety, testified that Welles' vision does not impair his ability to drive a bus. The second agreed with that opinion and further stated that he did not believe that Welles posed a serious threat to the safety of others, despite finding upon examination that Welles' left eye is of no practical use.

The employer, MTC, introduced the expert testimony of Dr. Arthur Keeney, a nationally recognized opthamologist and Dean of the University of Louisville Medical School who has specialized in vision as it relates to safe driving. Dr. Keeney testified that his research, and that of others, reveals that drivers with vision impairment such as Welles' have four times the risk of being involved in an automobile accident

---

**6.** Stereopsis is that element of depth perception involving the use of both eyes.

and that such drivers have a reduced field of awareness of about 20% on the nonsighted side, which means that, in turning his head to compensate for this reduced field of awareness on his left side, vision will be lost on his right side. Dr. Keeney was of the opinion that Welles' reduced peripheral vision on his left side prevents him from perceiving such details as a small child or a bicycle and that a speck of dust in Welles' right eye, causing him to close that eye, could render him totally blind. Dr. Keeney concluded that Welles suffers from a 24% impairment of his total visual system and would pose a serious threat to the safety of others, notwithstanding his driving record.

The MTC also introduced the testimony of one of its instructors with normal vision who had conducted a test by driving a bus with his left eye closed at times. The instructor testified that a driver, in effect, sits in a "fishbowl" and that 80% of the time the driver's vision is directed straight ahead. Facing forward, the instructor could view 30 inches of the left window and left rear view mirror. When he closed his left eye he lost all view of the left window and the left rear view mirror. When he turned his head to see the left mirror he lost sight of the right half of the front window. The instructor testified that, in his opinion, Welles posed a serious threat to the safety of others while driving an MTC bus.

In *Lewis v. Remmele Engineering, Inc.*, 314 N.W.2d 1 (Minn.1981), we stated that an employer may "satisfy the standard of a 'serious threat' to [the safety of others by] * * * establish[ing] that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm." *Id.* at 4 (citation omitted). In view of the testimony presented by the MTC, the trial court's determination that the employer has sustained its burden of establishing, by competent medical evidence, that Welles' disability poses a serious threat to the safety of others is not clearly erroneous.

3. Appellant lastly contends that the trial court erred in finding the MTC's vision requirement to be a bona fide occupational qualification (BFOQ), an exception to the prohibition against employment discrimination. In *Remmele Engineering* we adopted the standard of *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969), that an employer, in order to rely on a bona fide occupational qualification exception, must present a factual basis to establish that all or substantially all persons not meeting the qualification would be unable to perform safely and efficiently the duties of the job involved. 314 N.W.2d at 3. The concern in *Remmele Engineering* was for the safety and health of a job applicant who suffered from epilepsy. While the *Weeks'* standard may be appropriate where only the employee's safety is jeopardized, our concern in the instant case goes beyond that of the employee and must include consideration of the well-being and safety of bus passengers, other motorists and pedestrians.

In *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir. 1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975), the court found Greyhound's age limitation to be a BFOQ, emphasizing that "the lives of numerous persons are completely dependent on the capabilities of the job applicant." *Id.* at 861–62. With the safety of bus passengers in mind, the court in *Hodgson* adopted a more appropriate standard for that employer to meet in relying on a BFOQ.

[A] public transportation carrier, such as Greyhound, entrusted with the lives and well-being of passengers, must continually strive to employ the most highly qualified persons available for the position of intercity bus driver for the paramount goal of a bus carrier is safety. Due to such compelling concerns for safety, it is not necessary that Greyhound show that all or substantially all bus driver applicants over forty could not perform safely. Rather, to the extent that the elimination of Greyhound's hiring policy may impede the attainment of its goal of safety, it must be said that such action undermines the essence of Greyhound's operations. Stated differently, Greyhound must dem-

onstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers. Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice.

*Id.* at 863. Where consideration for the safety of passengers and the public is involved, we adopt the standard articulated in *Hodgson.* In this case, a bona fide occupational qualification is established if there is a rational basis in fact to believe that elimination of the MTC vision standard would increase the likelihood of risk of harm to MTC passengers.

The trial court stated that:

the elimination of the vision standard or the lessening of it would increase the likelihood of harm to [MTC] passengers as well as to the general public. * * * [T]he testimony demonstrated that such a likelihood does exist.

We agree and find the trial court's conclusion that the MTC's vision requirement[7] is a BFOQ is not clearly erroneous.

In *Boynton Cab Co. v. Department of Industry, Labor and Human Relations,* 96 Wis.2d 396, 291 N.W.2d 850 (1980), the Wisconsin Supreme Court held that the elimination of the employer's rule against hiring one-handed taxi drivers would present an increased risk of harm to passengers and that the employer had met its burden of establishing the rule as a BFOQ. The court found evidentiary support for the employer's belief of increased risk in the employer's reliance on the Federal Motor Carrier Safety Regulation. *Id.* at 416–18, 291 N.W.2d at 860–61.

In the instant case, not only has the MTC, like the Boynton Cab Company, voluntarily adopted the same regulations, but it has presented substantial evidence to establish

that a driver suffering from vision limitations poses an increased risk to the safety of MTC passengers. Dr. Keeney testified that drivers with vision such as Welles' have a statistically greater incidence of accidents, that vision of 20/40 Snellen or better is required for safe driving because traffic signs are designed to be read by drivers having at least the minimum degree of vision, and that the increased stress placed on drivers who work long shifts during peak traffic hours requires drivers to have optimum visual abilities. In Dr. Keeney's opinion, drivers with less than 20/40 vision pose a serious risk to the safety of others. Also in evidence was the American Medical Association's recommendation that persons with vision worse than 20/40 Snellen in either eye should not be allowed to serve as professional drivers of passenger buses. American Medical Association Committee on Medical Aspects of Automotive Safety, "Visual Factors in Automobile Driving, and Provisional Standards," 81 Archives of the Academy of Opthamology 865, 867 (June 1969).

Appellant argues that the MTC did not adopt the Department of Transportation (DOT) Motor Carrier Safety Regulations insofar as they require 20/40 or better vision in each eye because MTC Rule 5 states that the DOT regulations are applicable only "[t]o the extent not in conflict with * * * Minnesota Statutes." Welles contends that the portion of the DOT regulations which requires 20/40 or better vision in each eye to drive a bus conflicts with Minn.Stat. § 171.02, subd. 2(b) (1980), which requires a Minnesota Class B license to drive a bus, a license he possesses.

Whether a conflict exists may be determined by the general principles we stated in *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 143 N.W.2d 813 (1966):

(c) [A] conflict exists where the ordinance forbids what the statute *expressly* permits. * * *

---

7. We note that the federal standards voluntarily adopted by the MTC require distant visual acuity in each eye of 20/40 (Snellen) without corrective lenses or with corrective lenses. 49 C.F.R. 391.41(b)(10) (1981).

(d) It is generally said that no conflict exists where the ordinance, though different, is merely additional and complementary to or in aid and furtherance of the statute.

*Id.* at 352, 143 N.W.2d at 816–17 (emphasis in original). The statute does not expressly authorize anyone with a Class B license to drive a bus but makes a valid license a requirement, stating: "No person * * * shall drive any motor vehicle upon any street or highway in this state unless such person has a license valid under the provisions of this chapter for the type or class of vehicle being driven." Minn.Stat. § 171.02, subd. 1 (1980). Minnesota Statute § 473.-405, subd. 3 (1980) authorizes the MTC to "prescribe and promulgate rules and regulations * * * in furtherance of the purposes of [the Metropolitan Transit Commission Act]." Minnesota Statute § 473.402, subd. 1 (1980) states that it is the goal of the MTC to function "for the protection and advancement of the public health, safety, and welfare."

The MTC rule prescribing the vision standards for MTC bus drivers is a furtherance of the legislatively mandated policy permitting the MTC to adopt rules to assure safety in the operation of buses. The rule adopting MTC vision standards is not in conflict with the statutory requirements of a Class B license. The rule is additional and complementary to Minn.Stat. §§ 171.02 and 473.405.[8]

We affirm the judgment of the trial court.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

---

**8.** Appellant's argument, carried to its logical extent, would preclude municipalities from enforcing ordinances for the licensing of professional drivers where the ordinances contain requirements beyond those for obtaining a state license. For example, the City of Minneapolis places requirements on applicants for taxicab licenses which are in addition to state requirements for a state driver's license. See Minneapolis Code § 341.360 (1981).