Michael SAMENS, Petitioner-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Respondent,

WISCONSIN POWER & LIGHT COMPANY, Respondent-Petitioner.

Supreme Court

*No. 81–2215. Argued January 4, 1984.—Decided March 27, 1984.*

(Also reported in 345 N.W.2d 432.)

648

For the respondent-petitioner there were briefs by *Frank J. Bucaida, Steven J. Schooler* and *Brynelson, Herrick, Gehl & Bucaida,* Madison, and oral argument by *Frank J. Bucaida.*

For the petitioner-appellant there was a brief by *William Smoler* and *Smoler, Albert & Rostad,* Madison, and oral argument by *William Smoler.*

Amicus curiae brief was filed by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general, for the Labor and Industry Review Commission.

Amicus curiae brief was filed by *Linda A. Leaf,* Milwaukee, and *Debbie M. Zuckerman, Alexandra K. Finucane* and *Epilepsy Foundation of America,* Landover, Maryland, for the Epilepsy Foundation of America, Wisconsin Epilepsy Association, Inc., and Wisconsin Coalition for Advocacy.

LOUIS J. CECI, J.   This is a review of an unpublished decision of the court of appeals that reversed the judgment of Columbia county circuit court Judge Howard Latton in an administrative review action.  The judgment which the court of appeals reversed was an order of the Wisconsin Labor and Industry Review Commission, dismissing Michael Samens' handicap discrimination complaint against Wisconsin Power and Light Company.  The Wisconsin Labor and Industry Review Commission (commission) determined that Samens had failed to show that Wisconsin Power and Light Company (WP&L) had violated the Wisconsin Fair Employment Act (FEA) when it refused to hire him for the job of truck driver/groundman because Samens suffered from epilepsy.  The circuit court affirmed the commission's order, and the court of appeals reversed and remanded the matter, determining that the commission had utilized the improper standard in deciding that WP&L's refusal to hire Samens was justified under the exception to handicap discrimination found in the FEA.  We reverse the court of appeals.

Samens was eighteen years old when he applied for the position of truck driver/groundman with WP&L on Sep-

tember 29, 1975. It appears that he had a long history of epilepsy, having suffered from a series of petit mal seizures throughout his childhood. His last recorded childhood seizure occurred when he was seven years old. On December 9, 1974, approximately ten months before he submitted his job application with WP&L, Samens experienced his only grand mal seizure. At the time of the seizure, he was also suffering from a bout with infectious mononucleosis. Following his seizure, his neurologist, Dr. Kenneth M. Viste, Jr., performed an electroencephalogram. Dr. Viste's records indicate that the electroencephalograph was "grossly abnormal," showing bilateral spikes at $3\frac{1}{2}$, $4\frac{1}{2}$ per second, generally with poly spikes. The doctor interpreted this reading as associated with an occurrence of clinical seizures, "likely of a generalized type."

On June 12, 1975, a second electroencephalogram was performed on Samens by Viste. Once again, the doctor noted an abnormal recording, which he continued to interpret as associated with the occurrence of clinical seizures. The record indicates that Dr. Viste controlled Samens' condition by virtue of daily doses of both Dilantin and Phenobarbital, up until November of 1976. After that time, Samens was maintained on a daily dose of three hundred milligrams of Dilantin.

Samens was interviewed for the position at WP&L on December 9, 1975. During the interview, Samens revealed that he had a history of epilepsy.[1] In a letter dated December 16, 1975, Samens was told that he had been rejected by the company. Thereafter, he continued to inquire with WP&L concerning future employment as

---

[1] Samens' only reference to his condition on the job application was in response to the question, "Have you been hospitalized or treated by a doctor during the last ten years?" He checked "Yes" on the application, and, when asked to provide information concerning where and for what reason, he responded that he had received treatment in Oshkosh for having "passed out."

a truck driver/groundman. After the company requested and received Samens' medical records, he was informed that other, clerical-type positions were available to him, but not that of a truck driver/groundman.

On December 8, 1976, Samens filed a complaint with the Department of Industry, Labor and Human Relations, Equal Rights Division. Following an investigation, the department's investigator rendered an initial determination on May 9, 1977, finding probable cause to believe that WP&L had discriminated against Samens because of his epilepsy, contrary to the FEA. Efforts at conciliation between the parties failed, and a hearing was conducted before a hearing agent, pursuant to sec. 111.36 (2), Stats., on November 10, 1977, and April 7, 1978. The hearing agent issued his decision, with an accompanying opinion, on May 5, 1978. The agent's order, with a few minor corrections, was adopted by the full commission on June 26, 1980.

The hearing agent found that as a matter of fact, WP&L had refused to hire Samens because of his epilepsy. However, the agent also found that there was a "possibility" that Samens could suffer a seizure while working and noted that the position of truck driver/groundman was such that "the very lives of co-employees" on the crew revolved around the successful performance of the groundman's duties. After taking into account the effects of a possible seizure upon procedures in which a truck driver/groundman would be involved, the agent concluded that WP&L's decision that Samens' employment presented an "unacceptable risk" was "completely with foundation." Accordingly, the hearing agent and, subsequently, the entire commission determined that Samens' handicap discrimination complaint should be dismissed because he had not shown that WP&L had violated the FEA when the company rejected his application.

Samens sought judicial review of the commission's order in the Columbia county circuit court, pursuant to ch. 227 of the Wisconsin Statutes, on July 11, 1980. Samens argued that the commission had utilized the improper legal standard in determining that his employment would create a hazard at WP&L. Because the hearing agent had found that there was only a "possibility" that Samens would suffer a seizure while working as a truck driver/groundman, Samens concluded that the agent had utilized the standard for common carriers set out in *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d 396, 291 N.W.2d 850 (1980).[2] Samens challenged the use of this standard because WP&L does not function as a common carrier and argued that the agent should have utilized the more rigorous standard enunciated in *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d 408, 280 N.W.2d 142 (1979).[3] The commission, also a party in the instant case, brought a motion in circuit court to remand the matter to the commission for further proceedings to consider the appropriate legal standard for resolving the dispute and, utilizing this legal standard, to determine whether WP&L's rejection of Samens was legitimate under sec. 111.32(5)(f), Stats. (1973).[4] The

[2] The *Boynton* standard for common carriers requires that the company show that its hiring standard bore a rational relationship to the safety obligations imposed upon it as a common carrier and that the standard used was not the result of an arbitrary belief lacking in objective reason or rationale. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 404.

[3] The *Bucyrus-Erie* standard requires that the employer must establish to a reasonable probability that because of the individual's physical condition, employment in the position sought would be hazardous to the health or safety of the individual or to other employees or frequenters of the work place. *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 421.

[4] The basis for the commission's motion was this court's recently published decision of *Chicago & N.W. R.R. v. Labor & Ind. Rev. Comm.,* 98 Wis. 2d 592, 297 N.W.2d 819 (1980).

circuit court denied the motion and subsequently issued its decision on September 30, 1981, followed by an order and judgment dated October 22, 1981.

The exception to handicap discrimination, as contained in sec. 111.32(5)(f), Stats. (1973), reads as follows:

"(f) The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. An employer's exclusion of a handicapped employe from life or disability insurance coverage, or reasonable restriction of such coverage, shall not constitute discrimination."

This statute has been repealed and recreated several times since its effective date. The present statute dealing with the exception, sec. 111.34, effective August 4, 1982, provides in part:

"(2)(a) Notwithstanding s. 111.322, it is not employment discrimination because of handicap to refuse to hire, employ, admit or license any individual, to bar or terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment if the handicap is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment, membership or licensure.

"(b) In evaluating whether a handicapped individual can adequately undertake the job-related responsibilities of a particular job, membership or licensed activity, the present and future safety of the individual, of the individual's coworkers and, if applicable, of the general public may be considered. However, this evaluation shall be made on an individual case-by-case basis and may not be made by a general rule which prohibits the employment or licensure of handicapped individuals in general or a particular class of handicapped individuals.

"(c) If the employment, membership or licensure involves a special duty of care for the safety of the general public, including but not limited to employment with a common carrier, this special duty of care may be considered in evaluating whether the employe or applicant can adequately undertake the job-related responsibilities of a particular job, membership or licensed activity. However, this evaluation shall be made on an individual case-by-case basis and may not be made by a general rule which prohibits the em-

The court noted that the employer bears the burden of establishing that its conduct in refusing to hire an individual is legitimate under the exception to handicap discrimination once the complainant has proved that the refusal was in fact based upon the complainant's handicap. The court also noted that the Wisconsin Supreme Court decisions addressing this issue have indicated "flexibility" in dealing with the subject and have also revealed that "each case should be decided upon its own circumstances and merits." Although the court stated that in this case the facts appeared to more closely resemble those in the *Boynton* case, the judge concluded that the commission's decision had met the more stringent "reasonable probability" standard as set forth in the *Bucyrus–Erie* case. Thus, the court did not address the issue of whether the lesser *Boynton* standard should be applied in the instant case. Based upon this determination, the circuit court affirmed the commission's order dismissing Samens' complaint.

Samens then appealed to the court of appeals. The court of appeals stated that the controlling issue was whether the commission had utilized the proper standard in determining whether WP&L was justified under the sec. 111.32(5)(f) exception to handicap discrimination for its rejection of Samens because of his epilepsy. After

ployment or licensure of handicapped individuals in general or a particular class of handicapped individuals."

Section 111.32(5)(f) was repealed and recreated by ch. 275, sec. 18, Laws of 1975, effective May 27, 1976. However, because Samens' right of action accrued under the 1973 provision in effect at the time that WP&L refused to hire him, in December of 1975, the following changes in the statutory language do not apply. *Boynton Cab Co. v. ILHR Department*, 96 Wis. 2d at 400–01, n. 2; *Dairy Equipment Co. v. ILHR Department*, 95 Wis. 2d 319, 331–32, 290 N.W.2d 330 (1980); *Bucyrus-Erie Co. v. ILHR Department*, 90 Wis. 2d at 419, n. 4. *See also*, sec. 990.04, Stats. All references in the balance of this opinion to sec. 111.32(5)(f), Stats., are to the 1973 statutes.

noting the differences in the standards set forth by this court in the *Boynton* and *Bucyrus-Erie* cases, the court rejected the argument that WP&L had only to show a "rational relationship between Samens' handicap and its decision not to employ him because of safety considerations." The court of appeals refused to extend the *Boynton* standard beyond the area of common carriers, determining that *Boynton* did not create a "hazardous occupation" exception to the *Bucyrus-Erie* rule which ought to include companies generating and transmitting electricity.

The court of appeals then reviewed the commission's decision in order to determine whether it met with the "reasonable probability" standard articulated by this court in *Bucyrus-Erie*. The court noted that the commission had referred only to the fact that a "possibility" existed that Samens might suffer a seizure while working as a truck driver/groundman and that there was no finding of whether the possibility of such a seizure amounted to a "materially enhanced risk of death, or serious injury to the employee or others." *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 423. Although Samens urged the court to find that as a matter of law, WP&L had failed to meet its burden of proving a reasonable probability of hazard, the court of appeals refused to make such a determination. Accordingly, the court concluded that remand to the commission for further findings consistent with the *Bucyrus-Erie* standard was the appropriate remedy. *Wehr Steel Co. v. ILHR Dept.,* 106 Wis. 2d 111, 121, 315 N.W.2d 357 (1982).

WP&L has appealed to this court from the court of appeals decision.[5] Although both WP&L and Samens have argued numerous issues on appeal, we find the controlling issue in this case to be whether WP&L's fail-

---

[5] The commission has also submitted a brief to this court, requesting that we select an appropriate standard and clarify the law.

ure to hire Samens because of his handicap amounts to a discrimination prohibited by the Wisconsin FEA.

However, to resolve this controlling issue, there are two underlying issues that must also be answered. They are: (1) Did the commission utilize the proper standard by finding that the "possibility" of Samens' suffering an epileptic seizure created an unacceptable risk of hazard, based upon the nature of the job and the circumstances in which it is performed, and (2) utilizing the proper standard, did WP&L act legitimately under the exception to handicap discrimination as set forth in sec. 111.32 (5) (f), Stats., when it refused to hire Samens?

I.

DID THE COMMISSION UTILIZE THE PROPER STANDARD IN FINDING THAT THE "POSSIBILITY" OF SAMENS' SUFFERING AN EPILEPTIC SEIZURE CREATED AN UNACCEPTABLE RISK OF HAZARD, BASED UPON THE DUTIES OF THE POSITION AND THE NATURE OF THE WORK INVOLVED?

In this review, we are concerned with the commission's application of sec. 111.32 (5) (f), Stats., to the set of facts involved in this case. Such issues involve questions of law and are always reviewable by this court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 405; *Pabst v. Department of Taxation,* 19 Wis. 2d 313, 322, 120 N.W.2d 77 (1963). This court has acknowledged that the appellate court's scope of review is identical to that of the circuit court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 405; *Scharping v. Johnson,* 32 Wis. 2d 383, 145 N.W.2d 691 (1966).

In *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d 396, this court articulated three elements which are

necessary to establish that an individual has been discriminated against in the area of employment because of his or her handicap. These elements are: (1) That the individual is handicapped within the definition of the FEA, (2) that the individual has shown that the employer's discrimination was because of the handicap, and (3) that the employer's action was not legitimate under sec. 111.32(5)(f), Stats. *Id.* at 406. In the instant case, both parties concede that Samens is handicapped. Therefore, it appears that only the second and third elements are in dispute.

Concerning the second element, WP&L has attempted to show that Samens was not the best qualified applicant for the position of truck driver/groundman. In fact, WP&L has devoted a large portion of its brief to the discussion of this issue. However, the hearing examiner found that as a matter of fact, WP&L had disqualified Samens because he suffered from epilepsy.[6]

Under sec. 227.20(1), Stats. (1973),[7] the following standard applies when reviewing findings of fact:

"227.20 **Scope of review.** (1) The review shall be conducted by the court without a jury and shall be confined to the record . . . . The court may affirm the decision

---

[6] In the "Findings of Fact," the hearing agent rendered the following decision:

"6. While the Respondent has attempted to show that the Complainant was not the most qualified of candidates for the position it was seeking on December 15, 1975, the facts of record clearly indicate and support a finding, and it is hereby found as a matter of fact that the Complainant was disqualified, because, on December 15, 1975, he suffered from epilepsy."

[7] Once again, we find that sec. 227.20, Stats. (1973), applies, because the alleged discrimination occurred in 1975. Section 227.20 (1), Stats. (1973), was repealed, sec. 227.20(2) was renumbered 227.20(10), and secs. 227.20(1)–(9) were created by secs. 23–25, ch. 414, Laws of 1975, effective in September of 1976, after the date of the alleged discrimination.

of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

". . .
"(d) Unsupported by substantial evidence in view of the entire record as submitted . . . ."

Substantial evidence has been explained as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 418, citing *Bell v. Personnel Board,* 259 Wis. 602, 608, 49 N.W.2d 889 (1951).

When we review the record, we find in it a memo dated November 9, 1976, from Arthur Kalsbeek, manager of area electrical operations at WP&L, who was also involved in the selection of a candidate for the truck driver/groundman position. The memo contains the following language:

"This applicant was interviewed on December 9, 1975 for Truck Driver Groundman. At that time he was unsuccessful based on the fact that during the interview it was brought out that he had epileptic seizures and was on a maintenance dose of dilantin. Because the nature of line construction and maintenance is hazardous, a physical condition of this type is considered cause of disqualification."

Kalsbeek testified that the sole reason that Samens was rejected was because a better qualified candidate was found. However, the investigator for the Equal Rights Division of the Department of Industry, Labor and Human Relations who spoke with Mr. Forbes from the personnel department of WP&L testified that Forbes indicated to her that Samens was not hired because of his epilepsy.[8]

---

[8] John George Fabie, director of safety for WP&L, testified that after receiving medical information from Dr. Viste concerning

It is not this court's function to judge the credibility of the witnesses or the weight of the evidence on review. *Stacy v. Ashland County Dept. of Public Welfare,* 39 Wis. 2d 595, 603, 159 N.W.2d 630 (1968). Rather, utilizing the substantial evidence test, this court must decide whether reasonable minds could have reached the same conclusion that was reached by the commission. This process involves an evaluation of the evidence by this court, to decide whether the sufficiency of the evidence attains that level of substantiality which supports a finding that reasonable minds acting as such could reach the decision reached by the commission. *Id.* As this court has noted,

" 'Substantial evidence is not equated with preponderance of the evidence. There may be cases where two conflicting views may each be sustained by substantial evidence. In such a case it is for the agency to determine which view of the evidence it wishes to accept. . . .' " *Bucyrus-Erie Co.,* 90 Wis. 2d at 418, citing *Robertson Transport Co. v. Public Serv. Comm.,* 39 Wis. 2d 653, 658, 159 N.W.2d 636 (1968).

Although conflicting testimony exists as to why Samens was rejected, we find that a reasonable person may have reached the conclusion that Samens was indeed disqualified because of his epilepsy. This is especially true because the conflict was presented by the testimony of Kalsbeek, who was the author of the above memo acknowledging Samens' rejection on the basis of his physical status. A reasonable mind may have concluded that WP&L never reached the point in its initial consideration of Samens where his credentials were actually evaluated alongside those of the six other candidates WP&L had

Samens, he informed Kalsbeek that Samens was physically unqualified for the position of truck driver/groundman. Fabie, however, did not participate in the selection of a candidate for the position that Samens had originally applied for.

selected for the interviewing process. Therefore, we find substantial evidence in the record to support the commission's finding that Samens was rejected solely because of his handicap.

Concerning the third element of a handicap discrimination case, namely, whether the employer's action is justifiable under exception to handicap discrimination, we must look to the provisions of the FEA, as set out in secs. 111.31–111.36, Stats. (1973). This court has stated that the provisions of the act are to be liberally construed in order to effectuate its purpose of preventing discrimination, since discrimination essentially deprives its victims of the opportunity of earning a decent living. *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 419; *Wisconsin Telephone Co. v. ILHR Dept.,* 68 Wis. 2d 345, 368, 228 N.W.2d 649 (1975); sec. 111.31. However, this court has acknowledged that the act was not intended to force employers to hire a handicapped individual in all situations.

"We do not believe that the legislature when proscribing discrimination against those physically handicapped intended to force an employer into the position of aiding a handicapped person to further injury, aggravating the intensity of the handicap or creating a situation injurious to others. Such an interpretation would compromise not only the best interests of the handicapped but all concerned." *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 423.

This concern is embodied in sec. 111.32(5)(f), which reads as follows:

"The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. . . ."

In *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d 408, this court considered the application of sec. 111.32 (5) (f), Stats., to situations where an employer refuses to hire an individual because of a handicap. The *Bucyrus-Erie* court acknowledged that the ability to efficiently perform a job involves more than being capable of the physical strength and skill required by a position. Noting that both the individual's safety and the safety of others is a factor to be considered in determining whether a handicapped individual is capable of performing a job "without a materially enhanced risk of death, or serious injury to the employee or others in the future," the court set down the following standard:

"If the evidence shows that the applicant has a present ability to physically accomplish the tasks which make up the job duties, the employer must establish to a *reasonable probability* that because of the complainant's physical condition, employment in the position sought would be hazardous to the health or safety of the complainant or to other employees or frequenters of the place of employment." *Id.* at 423–24 (Emphasis added.)

This standard has been utilized in subsequent decisions. *See, Chicago & N.W. R.R. v. Labor & Ind. Rev. Comm.,* 98 Wis. 2d 592; and *Dairy Equipment Co. v. ILHR Department,* 95 Wis. 2d at 332–33. The standard implies that individual evaluation of the job applicant is necessary in order to establish to a reasonable probability that employment of the individual would constitute a hazard. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 409.

In *Boynton Cab Co.,* this court considered the sec. 111.32(5) (f) exception as it relates to hiring standards set by common carriers of passengers. *Id.* The *Boynton* court noted that federal cases have consistently held common carriers to a lighter burden concerning hiring standards based upon safety considerations because of

the unique interest of common carriers in promoting driver safety. *Id.* at 410. *See, Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir. 1976) ; and *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir. 1974), *cert. den. sub nom. Brennan v. Greyhound Lines, Inc.,* 419 U.S. 1122 (1975). The *Boynton* court also noted that in *Bucyrus-Erie,* this court acknowledged that a lesser burden is appropriate for common carriers.

" 'Obviously the high standards recognized for certain employees in the common carrier industry are not applicable to a welder at Bucyrus-Erie.' " *Id.* at 410, citing *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 423.

Thus, the *Boynton* court concluded that the following standard should be applied to the safety-based hiring standards of common carriers:

" '[T]he proper burden to be borne by Boynton was to show that its hiring standard bore a *rational relationship* to the safety obligations imposed upon a common carrier of passengers and that the standard used by Boynton was not the result of an arbitrary belief lacking in objective reason or rationale.' " *Id.* at 404 (Emphasis added.)

In the instant case, Samens argued, and the court of appeals agreed, that the commission should have utilized the more stringent *Bucyrus-Erie* standard of "reasonable probability of hazard" in determining whether hiring Samens because of his handicap would constitute a hazard to Samens, co-employees, or frequenters of the work place. The court rejected the argument made by WP&L that the court ought to extend the common carried standard to WP&L because it deals with a highly dangerous force, namely, electricity, and is, therefore, charged with a high duty of care to the public because of the dangerous nature of electricity. *See, Dansbery v. Northern States Power Co.,* 188 Wis. 586, 591, 206 N.W. 882 (1926).

No matter which burden is imposed, once Samens has demonstrated that he was rejected by WP&L because of his handicap, the burden of proof then shifts to the company to justify this rejection under the statute. *Boynton Cab Co. v. ILHR Department*, 96 Wis. 2d at 407–08; *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept.*, 62 Wis. 2d 392, 398–99, 215 N.W.2d 443 (1974). In either case, the focus narrows to whether Samens possessed the ability to efficiently perform the duties of a truck driver/groundman. This burden embraces two distinct points: (1) Was Samens physically able to perform the duties of a WP&L truck driver/groundman, and (2) would hiring Samens constitute a hazard to himself, co-employees, or the public. *Boynton Cab Co. v. ILHR Department*, 96 Wis. 2d at 408, and *Bucyrus-Erie Co. v. ILHR Department*, 90 Wis. 2d at 423. Because WP&L has not sought to prove that Samens could not physically carry out the duties required of a truck driver/groundman, our analysis must then turn to whether his employment would constitute a hazard under sec. 111.32(5)(f), Stats. In any event, we believe that this calls for a detailed look at the duties of the job and the nature of the work involved.

The position for which Samens applied, that of truck driver/groundman, involves a variety of duties, including driving a truck and working with the line crew. This was revealed by the testimony of Arthur Kalsbeek, who as manager of area electrical operations, is familiar with the duties of a truck driver/groundman. A description of these duties was repeated to a certain extent by Thomas Samens, Michael Samens' father, who, having worked as a lineman for fifteen years, is acquainted with the groundman's duties. The duties which the commission focused upon, and which we believe to be most pertinent to this case, involve the actual duties of the

groundman in conjunction with the line crew in replacing and maintaining poles and power lines and in repairing high-voltage transmission towers.

The groundman's truck is equipped with a hydraulically operated boom that is activated and operated by a series of controls located at the rear of the truck. The boom is forty-two feet in length and is operated by six to ten hand-operated levers and a foot pedal. The groundman alone operates the boom by the use of the hand levers and foot pedal. One of the duties which the groundman is expected to perform by use of the boom involves the replacement of old electrical poles. To replace old poles, the groundman must dig a hole by utilizing an auger attached to the hydraulic boom. He then must lift and insert a forty-five-foot, one thousand-pound pole into the completed hole. This is accomplished with the assistance of two fellow crewmen who, standing on the ground, guide the pole between energized overhead wires. The groundman has to "snake" the top six and one-half feet of the pole, before it is set into the ground, between energized conductors which may have a voltage of anywhere between 12,400 and 69,000 volts. The groundman must then maintain the pole in a vertical position while he utilizes a hydraulic tamp to pound dirt back into the hole surrounding the pole.

After a new pole has been placed into the ground, the conductors from the old pole must be transferred to the new one. A "hot line arm," or fiberglass appendage, is attached to the boom so that the existing energized wires on the old pole may be clamped into saddles. This allows the conductors to be raised slightly so that a lineman on the old pole may disconnect the existing wires. However, in order to raise the wires, the hot line arm must be properly positioned. This is accomplished by coordination between the lineman, who is in a better position to see the proper alignment, and the groundman, who is

down below on the truck's operating platform. As the lineman communicates the necessary instructions, the groundman responds by raising, extending, or rotating the boom, in order to align the hot line arm with the existing wires. One must keep in mind that these wires are energized.

After the wires have been removed, the groundman must leave the truck and lift a cross-arm to the lineman on the new pole by use of a hand line equipped with hooks. This, too, requires coordination between the lineman and the groundman.

After the cross-arm is in place, the groundman must return to the truck and lower the wires gently onto the indentation on the top of the insulators located on the cross-arm. The lineman then utilizes tie wires to secure the electrical wires to the cross-arm.

Transformers, capacitor banks, and regulators may also be raised to the tops of poles. Transformers may weigh from 400 to 1,000 pounds and are moved by the groundman by use of the boom to within reaching distance of a lineman on the pole. Capacitor banks and steel arms containing regulator switches are similarly placed, after maneuvering through existent energized wires.

The groundman also assists in the maintenance of transformer towers, by removing and replacing sections of the extra-high-voltage structures. Once again, by using the boom, he raises and lowers sections of the tower which may weigh between 3,000 and 4,000 pounds. As the groundman is carrying out this maneuver, linemen are usually present on the main structure of the tower and another lineman in an aerial basket may be nearby.[9] A crane is also present, to support the tower's main structure.

---

[9] Aerial baskets may be attached to the boom for linemen to work from, and it appears that these baskets are equipped with safety controls similar to those of the groundman.

A crew normally is made up of four to fourteen members. While some of the personnel may remain behind on the ground, linemen are normally present on the poles or towers at virtually all times during the above procedures. The groundman carries out his operations of the boom on a two-by-two-feet step which folds down from the rear of the truck.[10]

A review of the record indicates that approximately fifty per cent of the groundman's job is devoted to duties involving work around energized wires, operating the controls of the hydraulic boom. Testimony also reveals that groundmen may be called upon to work overtime during storms. Such work necessarily involves working outside in adverse weather conditions. A groundman may also be asked to work while the individual is ill. Depending upon the region to which the crew is assigned, the groundman may not be able to return to his home at night during ninety per cent of the workweek. The record also reveals that much of the work is done in proximity to homes, businesses, and roadways.

The hearing agent concluded that "the very lives of the co-employees turn upon the successful execution of all job duties" that the truck driver/groundman is called upon to perform. This evidence is not in dispute. The testimony reveals that linemen are constantly on the poles when the groundman is raising objects such as cross-arms or utilizing the boom equipped with the hot line arm to raise energized wires so that the lineman may disconnect these wires. This work is performed in and around energized lines and involves the actual physical maneuvering of such lines, which we have noted may possess a voltage of between 12,400 and 69,000 volts. When poles are replaced, linemen are also present when the poles are threaded between overhead wires. As we

[10] WP&L also has a number of trucks where the boom may be operated from a platform on top of the turret.

previously observed, the testimony indicates that all of these efforts require cooperation and coordination between the lineman and the groundman.

The record also reveals that sudden movements of the levers and foot feed, with the associated sudden movement of the boom, may result in numerous dangers. Quick, erratic movements of the boom could result in the boom's striking the lineman on the pole or coming in contact with the energized lines. Contact with the lines may result in the truck itself becoming energized. Also, there is the possibility that sudden movements of the boom could cause breakage of the wires, if the contact were forceful enough. A possible consequence of broken wires is the electrocution of anyone with whom the wires come in contact should the wires fall, property damage from contact with the wires, and, of course, power outages. In addition, there is the danger that the weight alone of heavy objects may cause injury and property damage if the boom is moved without precision.

The hearing agent found that there was a "possibility" that Samens might experience a seizure while performing the above duties. Because of the ensuing dangers that could occur from sudden movements of the boom should Samens lose control of the mechanism while suffering a seizure, the agent concluded that WP&L's action was legitimate under sec. 111.32(5) (f), Stats. The agent reached this conclusion even though WP&L rejected Samens outright after learning of his epilepsy during the interview and prior to requesting any of his medical records. Thus, WP&L could not have individually evaluated Samens at the time of his rejection. Consequently, because of the agent's reference to a possibility of hazard, rather than a reasonable probability, and the lack of WP&L's individual testing of Samens, it is evident that the agent utilized the *Boynton* common carrier standard.

Under sec. 227.20 (2), Stats. (1973), due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency. However, no special deference is required when this court is as competent as the agency to decide the legal question involved. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 406, citing *Dept. of Revenue v. Milwaukee Refining Corp.,* 80 Wis. 2d 44, 48, 257 N.W.2d 855 (1977) ; *Dept. of Revenue v. Smith Harvestore Products,* 72 Wis. 2d 60, 65–66, 240 N.W.2d 357 (1976) ; and *Pabst v. Department of Taxation,* 19 Wis. 2d at 323–24. In *Dept. of Revenue v. Smith Harvestore,* this court stated that where disputed questions of law may be resolved from undisputed facts, this court is as competent as the agency to determine such questions. *Id.* at 66. Here, the nature of the groundman's duties, as well as the perils surrounding his work with electricity, are not in dispute. What is in dispute is whether or not the court should extend the common carrier standard to the facts of this case. This is a question of law, and this court is as competent as the commission to resolve it. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 407; *Dept. of Revenue v. Milwaukee Refining Corp.,* 80 Wis. 2d at 48; and *Dept. of Revenue v. Smith Harvestore,* 72 Wis. 2d at 66.

We find four factors which we believe are crucial to the resolution of this dispute. They are:

(1) The potentially life-threatening qualities of electricity;

(2) The nature of the groundman's duties, which involve working around electrical wires with heavy objects which must be maneuvered with precision and concentration, as well as manipulating the energized electrical wires themselves;

(3) The team-like efforts required of the groundman and the other linemen; and

(4) The proximity of the public to the crew's work.

When we take into account the above four elements, we believe that extending the common carrier standard to the instant case is mandated. In *Boynton Cab Co.*, this court stated the following:

"Because of their factual posture, the Wisconsin cases have evidenced a primary concern with the complainant's ability to perform the work adequately and *without undue danger to the complainant,* rather than concern that the complainant's handicap could be hazardous to third parties. It is apparent that Boynton's expressed concern is in respect to the safety of other persons, not the employee." *Id.* at 410, n. 7 (Emphasis added.)

Subsequently, the *Boynton* court concluded because of the duty owed by a common carrier to its passengers " 'to exercise the highest degree of care reasonably to be expected from human vigilance and foresight,' " a lighter burden concerning safety-based employment standards was appropriate. *Id.* at 416 (citation omitted).

Here, we are concerned not only with the safety of Samens, but also with that of the co-employees and the public. The added concern for Samens' safety which has been expressed by WP&L was not a concern in the *Boynton* case. Thus, we are faced with an additional element which was lacking when this court decided *Boynton.* However, we believe that the concerns in this case are much more similar to the *Boynton* case than those found in *Bucyrus-Erie* and its progeny, as the trial court noted. The thrust of the testimony is that any erratic movement of the hydraulic boom may result in contact with live wires possessing, at the very least, a voltage of 12,400 volts. Such contact may result in the injury or death of the groundman or, if the wires are knocked down, the injury or death of the co-employees or any other third party in the area. The groundman alone operates the boom. Other crew members are constantly present in the area and depend upon the performance of the groundman and

the coordination of his activities with theirs for their safety. The public is also normally in close proximity, whether traveling on highways or in nearby homes or businesses.

We believe that it is the exact nature of these dangers surrounding the groundman's activities which distinguishes this case from *Bucyrus-Erie* and subsequent decisions utilizing its standard. The job for which the individual in *Bucyrus-Erie* applied was that of a welder working in a plant and, therefore, isolated from the public. The welder worked alone and was also fairly isolated from co-workers. The main concern of the company was that the individual might drop equipment on himself or others or be unable to extricate himself from a weldment. *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d at 414. *See also, Chicago & N.W. R.R. v. Labor & Ind. Rev. Comm.,* 98 Wis. 2d at 597–98, where the company feared that a welder suffering an epileptic seizure may fall from a bridge, be injured by welding equipment or motorized vehicles, or suffer injury while standing adjacent to a railroad track and inspecting cars on a passing train; *Dairy Equipment Co. v. ILHR Department,* 95 Wis. 2d at 321–22, where the company terminated a worker because he had only one kidney and falling from a tank onto protruding objects or equipment may have injured the remaining kidney; and *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept.,* 62 Wis. 2d at 395, where the company terminated an asthmatic employee because working conditions in the diesel house might adversely affect his health.

In the instant case, we are faced with concerns for dangers of a much greater magnitude than those expressed in the above cases and affecting many more individuals than a single employee. Accordingly, we hold that because of the nature of the groundman's duties, involving work with a highly hazardous force, the teamlike efforts required of the groundman, and the close

proximity of the public, the common carrier standard is appropriate when reviewing WP&L's safety-based hiring standards relating to this particular position. We believe that extending this lesser standard is commensurate with the high degree of care imposed upon WP&L as an electric company and recognized by this court.

"It is also elementary that 'electricity is a powerful and subtle force. Electric wires are highly dangerous agencies, and it is well settled that companies generating and transmitting electricity over their wires are required to exercise a high degree of care and caution in order to prevent injury.'" *Reiland v. Wisconsin Valley Electric Co.*, 202 Wis. 499, 503–04, 233 N.W. 91 (1930), citing *Ottman v. Wisconsin-Michigan Power Co.*, 199 Wis. 4, 6, 225 N.W. 179 (1929). *See also, Dansbery v. Northern States Power Co.*, 188 Wis. 586.

Therefore, WP&L must demonstrate that its refusal to hire Samens bears a rational relationship to its safety obligations to the public and its own employees which are imposed upon it as a company producing and transmitting electricity and that the standard used by WP&L was not the result of an arbitary belief lacking in objective reason or rationale. *Boynton Cab Co. v. ILHR Department*, 96 Wis. 2d 396.

## II.

UTILIZING THE COMMON CARRIER STANDARD, WAS WP&L'S REFUSAL TO HIRE SAMENS LEGITIMATE UNDER THE EXCEPTION TO HANDICAP DISCRIMINATION CONTAINED IN § 111.32(5)(f), STATS.?

As we have set out above, WP&L must show that its rejection of Samens bore a rational relationship to the

safety obligations imposed upon the company and that the standard used by WP&L was not an arbitrary belief lacking in objective reason or rationale. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 404. In *Nottelson v. ILHR Department,* 94 Wis. 2d 106, 287 N.W.2d 763 (1980), this court discussed at length the scope of judicial review in administrative law actions. In that opinion, the court noted that one of the most "troublesome issues" in such cases is determining whether the application of a statutory concept to a set of facts should be treated as a question of fact or of law for purposes of judicial review. *Id.* at 115. The *Nottelson* court noted that Wisconsin case law is filled with conflicting standards of review when the court is concerned with the review of an agency's application of a statutory concept to a set of facts. Generally, however, such conclusions derived from underlying findings of fact are designated as legal conclusions. *Id.* at 116, n. 8, 9.

In this case, we are concerned with the commission's application of § 111.32(5)(f), Stats., to the set of facts before us. As the *Nottelson* opinion acknowledged, although the court may label such applications as legal conclusions, this does not necessarily imply that the court should ignore the commission's determination. *Id.* at 117. Though not bound by the agency's interpretation, this court has stated that when reviewing the agency's interpretation of a statute, through its application of the statute to a given factual situation, due weight will be accorded the agency's interpretation where the question involved is one of first impression. *Berns v. Wis. Employment Relations Comm.,* 99 Wis. 2d 252, 261, 299 N.W.2d 248 (1980). This appears to be the first instance of which we are aware that the commission has applied the *Boynton* standard to a factual situation which did not involve a common

carrier. Therefore, this was a question of first impression for the commission, and not a case where the "commission's interpretation reflects a practice or position 'long continued, substantially uniform and without challenge by governmental authorities and courts.' " *Id.,* citing *Wood County v. Bd. of Vocational, T. & A. Ed.,* 60 Wis. 2d 606, 618, 211 N.W.2d 617 (1973). Accordingly, we find that the interpretation given to sec. 111.32(5)(f), Stats., through the commission's application of the *Boynton* standard to a factual situation not involving a common carrier is entitled to be accorded due weight by this court.

Once again, we must turn to the testimony of Arthur Kalsbeek in order to determine whether the commission's conclusion of law is supported by the facts as found by the commission. Kalsbeek testified that there are times when the groundman must operate two levers at once in order to successfully manipulate the hydraulic boom and its various attachments. He also testified that these levers respond to slight pressure, with the resulting action of the boom varying with the degree to which the lever is moved. The greater the degree to which the lever is moved, the faster the associated action of the boom. If the levers are not moved, the boom will come to a complete stop. When asked about the foot feed, Kalsbeek stated that it acts to speed up or retard the engine, which controls the hydraulic flow rate to power the boom. He also stated that if one's foot is removed from the foot feed, all action will cease. Kalsbeek warned, however, that if the engine has been operating at an increased hydraulic flow rate, suddenly lifting one's foot from the foot feed could cause the groundman's truck to rock violently.

Dr. Viste was the only physician to testify, by way of deposition. While the rational relationship standard

does not entail individual testing of the applicant, and most of the doctor's testimony concerned Samens individually, we believe that the doctor's testimony concerning epilepsy in general must be considered.

The doctor testified that epilepsy can be controlled through medication and proper health care habits. He stated that concerning the chances of recurrent seizures, an individual who has had only one grand mal seizure, for example, will have a less than one-in-ten chance of a recurrent seizure in a year's time if the individual continues the proper medication and maintains good health habits. However, he qualified this by stating that medication is not a guarantee or cure-all and that variants may cause recurrent seizures.

The doctor also described the two types of seizures. The petit mal was characterized as "a very brief alteration in consciousness, generally a matter of several seconds up to as long as 30 seconds." Viste further stated that the individual may not even be aware that anything has happened and that falling is possible, although not likely. The grand mal was described as a more generalized type of seizure, involving a sudden loss of consciousness and also involving a loss of muscle tone. The doctor described the further effects as "falling to the ground, stiffening of the extremities, followed by shaking of the extremities, with a variable period of time of unconsciousness and a variable period of time of confusion thereafter, from several minutes up to several hours." When asked about whether the individual may have any forewarning of a seizure, Dr. Viste explained that petit mal by definition entails no such warning. Concerning the grand mal, he stated that a vast majority of epileptic individuals receive no warning, and the first time that they realize that they have suffered a seizure is when they regain consciousness, with someone at their side.

Dr. Viste also testified that an individual with a history of grand mal seizures whose condition has been controlled by the use of medication can experience a "convulsion" if the rest of his or her medical health is altered. He stated that sleep deprivation, alcohol ingestion, fever, or intense anxiety can lower the "seizure threshold" and precipitate a convulsion or seizure.

The pertinent and unrebutted testimony indicates that while some safety procedures are present on the groundman's apparatus, such as the cessation of the boom's movement when pressure on the foot feed or levers is removed, sudden, quick movement of these controls could result in the uncontrolled motions of the boom. We have already discussed the potential hazards of these uncontrolled movements. We also believe that a grand mal seizure, characterized by the loss of consciousness and a convulsive seizure with involuntary movement of the extremities, could clearly cause uncontrolled motions of the boom. At the very least, should the groundman lose consciousness, all controls would be released suddenly, which might cause the truck to rock if the engine had been operating at an increased flow rate. This is assuming that the groundman falls clear of the controls. Worse, however, is the possibility that he might slump against the controls, exerting pressure on them, with the resultant movement of the boom. In any event, all of the dangers we have discussed previously concerning contact with the wires, or wildly swinging heavy objects, could occur should the lineman experience a seizure.

Also, should an individual suffer a petit mal seizure with a brief alteration in consciousness, even the several seconds of alteration may result in the same dangers. As the testimony indicates, the manipulation of the boom requires constant attention, as well as communication and cooperation between the groundman and lineman.

Therefore, even a brief lapse of attention may cause the boom to contact wires, etc.

Although the evidence reveals that other crew members are present on the ground and could possibly assist the groundman, it also reveals that the groundman works alone on his platform at the back of the truck. In the short period of time required to reach the groundman, contact could be made with 12,400-voltage wires, or a 3,000-pound section of a tranformer tower might strike other crew members or equipment, other third parties, or adjacent property. Also, even though Dr. Viste testified that most epileptic individuals may control their seizures by medication, thereby reducing the chance of a recurrent seizure to as low as one chance in ten in a given year, he also stated that certain factors may lower the seizure threshold. Among these factors are fatigue, alcohol ingestion, anxiety, or illness. We find that two of these factors are precisely those which may be present when a groundman is called upon to work. During a storm, the groundman may have to work overtime. This may involve working through the night following an eight-hour shift and continuing on through the next day's full shift. Obviously, such overtime shifts may result in fatigue. Also, groundmen may be required to work when they are ill. We believe that these conditions may contribute to a lowered seizure threshold, ultimately precipitating a seizure.

Giving the agency's interpretation of sec. 111.32(5)(f), Stats., due weight, we hold that the hearing agent's conclusion of law that WP&L's refusal to hire Samens was rationally related to the safety obligations it owes the public and its employees as an electric company is supported by the facts as found by the agent.

In *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859, *cert. den.* 419 U.S. 1122, the seventh circuit addressed

the issue of whether Greyhound's age qualification, requiring applicants to be under forty years of age, constituted an unlawful discrimination. The *Hodgson* court utilized the following language, which we find pertinent to the case at hand:

"Due to such compelling concerns for safety, it is not necessary that Greyhound show that all or substantially all bus driver applicants over forty could not perform safely. Rather, to the extent that the elimination of Greyhound's hiring policy may impede the attainment of its goal of safety, it must be said that such action undermines the essence of Greyhound's operations. Stated differently, Greyhound must demonstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers. Greyhound need only demonstrate however a minimal increase in risk of harm for *it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice.*" 499 F.2d at 863 (Emphasis added.)

Similarly, we believe that WP&L need only show that the elimination of its policy concerning the hiring of individuals for the position of groundman might endanger the life of one more person than might otherwise occur under its present policy. We believe that the evidence in the record clearly demonstrates that the employment of an individual with epilepsy might jeopardize the safety of the individual, the other crew members, and the public, which is avoided by WP&L's refusal to hire such an individual. Therefore, the hearing agent's determination that WP&L demonstrated a rational basis to believe that hiring Samens posed an unacceptable risk of hazard is supported by the facts as found by the agent. *Boynton,* 96 Wis. 2d at 404.

We also note that utilizing this standard rejects Samens' argument that WP&L's rejection of him was

unjustified because it occurred prior to the company's request for his medical records. Samens argues strenuously that Dr. Viste has estimated his chance of a recurrent seizure as "very, very, very minimal" and that the company should have considered this before it rejected him. However, use of the common carrier standard does not entail individual evaluation or testing of the applicant, so Samens' chance of a recurrent seizure is irrelevant. As the *Hodgson* court noted:

> "*Greyhound need not establish its belief to the certainty demanded by the Government and the district court for to do so would effectively require Greyhound to go so far as to experiment with the lives of passengers in order to produce statistical evidence pertaining to the capabilities of newly hired applicants* forty to sixty-five years of age. Greyhound has amply demonstrated that its maximum hiring age policy is founded upon a good faith judgment concerning the safety needs of its passengers and others. It has established that its hiring policy is not the result of an arbitrary belief lacking in objective reason or rationale." 499 F.2d at 865 (Emphasis added.)

Likewise, we believe that WP&L need not consider the chances of the individual applicant's suffering a seizure. To force WP&L to evaluate each individual with epilepsy and ultimately test those individuals with a minimal chance of a seizure would impose too great a danger to the individual, WP&L's employees, and the public. Accordingly, we hold that WP&L has met the burden of showing that its refusal to hire Samens was not the result of an arbitrary belief lacking in objective reason or rationale. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 404.[11] As a result, we find that the commission's order must be upheld.

---

[11] We note that the hearing agent made detailed findings of fact regarding a lineman who suffered an epileptic seizure in 1976 and

In summary, we hold that the agency utilized the proper standard when it determined that WP&L had legitimately refused to hire Samens under the exception to handicap discrimination and that the agency's findings as demonstrated by the record support this conclusion. We also hold that the company need only demonstrate that its failure to hire Samens bore a rational relationship to the safety obligations imposed upon WP&L as an electric company and that the refusal was not the result of an arbitrary belief lacking in objective reason or rationale. The use of such a standard is mandated by the hazardous nature of electricity; the nature of the groundman's job, requiring a team effort between the groundman and the rest of the crew; and the proximity of the public to the crew's work.

*By the Court.*—The decision of the court of appeals is reversed; the judgment of the circuit court is affirmed.

---

was allowed by WP&L to return to the position of lineman. It appears that after one month away from the job, the individual was allowed to return to the limited duties of a truck driver/ groundman. Those duties did not involve operating the boom. Later, the individual in question was allowed to perform all the duties of the groundman.

The hearing agent distinguished this individual from Samens by noting that the individual had a negative electroencephalograph, while Samens had a "grossly abnormal EEG," was maintained on significantly higher doses of medication, etc. The agent concluded that there was a possibility that Samens could suffer a seizure, while the other individual's history revealed that his seizure had been an isolated occurrence.

We believe that such a finding was totally unnecessary and immaterial. As we have already noted, WP&L's hiring standard has been shown to bear a rational relationship to its safety obligations; the purpose of the standard is that WP&L cannot be forced to test an individual based upon that individual's medical history. Whether WP&L decides to retain an existing employee who does not meet this standard, because of the company's loyalty to its employees, etc., is not the issue before this court.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I would dismiss this petition for review as having been improvidently granted. This case is of limited importance to the bar, bench, or public. It concerns the 1973 version of the Fair Employment Act. The Act has been extensively revised more than once since 1973. Furthermore, the court of appeals did not require the individual to be hired; it remanded the matter for further proceedings. The case does not fall within our published guidelines for granting review. *Standards to Review Petitions to Appeal*, 85 Wis. 2d xiii.

In any event, I would affirm the decision of the court of appeals. Sec. 111.32(5)(f), Stats. 1973, provides that an employer need not hire a person who because of a handicap is "unable to efficiently perform [the job] at the standards set by the employer."[1] In *Bucyrus-Erie Co. v. ILHR Dept.*, 90 Wis. 2d 408, 423, 280 N.W.2d 142 (1979), the court held that the ability to perform efficiently "embraces the ability to perform without a materially enhanced risk of death, or serious injury to the employee or others in the future."

I read the 1973 statute to place a burden on the employer to establish that its hiring criteria as applied to the applicant are reasonable under all the circumstances. In other words, the employer has the burden of showing that its hiring decision is one that a reasonable person of ordinary prudence would make, balancing the right of a handicapped person to obtain gainful employment "to the fullest extent practicable," sec. 111.31(3), Stats. 1973, against the risk of harm

---

[1] Sec. 111.32(5)(f), Stats. 1973, provides:

"The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. . . ."

to the handicapped person and to others. The standard of "reasonableness" (the "reasonable probability test," as described in our cases) provides flexibility to permit due allowance to be made for the particular circumstances of the employment. The greater the likelihood of harm and the greater the severity of harm in case of an accident, the more stringent the job qualifications that the employer may apply to ensure safety.

Like the court of appeals, I see no need for a special legal test by which to gauge the hiring practices of a public service company. The majority opinion adopts the *Boynton* test, not the *Bucyrus-Erie* test, for Wisconsin Power and Light.[2] It errs because it mistakenly interprets the *Boynton* case as recognizing a special standard of care for common carriers and then mistakenly concludes that Wisconsin Power and Light, an electric company, is also held to a special standard of care.

There is no special standard of care for common carriers or for public service companies. Common carriers and public service companies are held to the same standard of care as everyone else: the reasonable person standard. As Dean Prosser explained, "None of these [common carrier] cases should logically call for any departure from the usual [due care] formula. What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care." Prosser, *Torts*, sec. 34, p. 181 (4th ed. 1971).[3] *See also Victorson v. Milwaukee and Suburban*

[2] The *Boynton* "one more life test" is of dubious usefulness and, if it is retained at all, it should be limited to the facts of the *Boynton* case. *Boynton Cab Co. v. ILHR Dept.*, 96 Wis. 2d 396, 291 N.W.2d 850 (1980).

[3] The special relation between a common carrier and its passengers does give rise to a special duty on the part of the common

*Trans. Corp.,* 70 Wis. 2d 336, 346, 234 N.W.2d 332 (1975).

I conclude that the 1973 statute sets forth one standard by which an employer's hiring decision should be gauged: reasonableness. The application of the standard varies with the circumstances.

The majority also errs when it interprets the 1973 statute as allowing the employer to adopt a general rule that it will not hire a person who has epilepsy and as allowing the employer to refuse to consider the ability of the individual applicant. I conclude that the statute requires the employer to consider each applicant on the basis of his or her qualifications. People with epilepsy are not a homogeneous group. The disorder called epilepsy has a number of causes and affects sufferers differently. It is not possible to conclude from this record that all or substantially all of those affected would pose a risk under the circumstances presented here. *See* Amici Curiae Brief submitted by the Epilepsy Foundation of America, the Wisconsin Epilepsy Association, Inc., and the Wisconsin Coalition for Advocacy.

Fortunately the majority opinion is limited to the 1973 statute. In sec. 111.34(2)(b)(c), Stats. 1981–82, the legislature requires that "evaluation shall be made on an individual case-by-case basis and may not be by a general rule which prohibits the employment . . . of handicapped individuals in general or a particular class of handicapped individuals."

I would affirm the decision of the court of appeals and remand the matter to the Commission for further findings by the Commission in light of the proper standard.

---

carrier to use due care to aid or protect the passengers, not a special standard of care. Restatement (Second) of Torts, sec. 314A (1964).